**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 4 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

FLONA M. HEIDEMAN; MARIEA
M. BERRYMAN; CRYSTAL
DIERINGER; HEATHER R.
LILJENQUIST; JENNIFER GOFF;
AMBER BLANKE; STACY LAMB;
BOBBIE GLEASON; AMY WOODS;
JANEEN BICKERSTAFF,

        Plaintiffs - Appellants,

    v.

SOUTH SALT LAKE CITY, A Utah
Municipal Corporation,

        Defendant - Appellee.

No. 02-4030

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:01-CV-918-J)**

---

W. Andrew McCullough, McCullough & Associates, LLC, Midvale, Utah, for
Plaintiffs-Appellants.

Scott D. Bergthold, Law Office of Scott D. Bergthold, P.L.L.C., Scottsdale,
Arizona (and David M. Carlson and Janice Frost, South Salt Lake, Utah, with him
on the briefs), for Defendant-Appellee.

Before **LUCERO**, **HARTZ** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

South Salt Lake City is a municipality of some 9,800 people, located immediately south of Utah's capital. The City's main artery, State Street or U.S. Highway 89, was the primary north-south highway in the area prior to construction of Interstate-15. State Street is the locus of a virtually uninterrupted string of gas stations, retail outlets, fast food restaurants, pawn shops, used car dealerships, old-fashioned drive-up motels, and the like; much of the City is occupied by light industry and the remaining area by modest single-family residences and apartments. The City's Chamber of Commerce touts the municipality as "Utah's Center of Industry."[1] Almost hidden among the warehouses and workshops of light industrial South Salt Lake City are – or were – three establishments featuring nude dancing.

The City Council recently enacted an ordinance prohibiting nudity within sexually oriented businesses. South Salt Lake City, Utah, Ordinance No. 2001-04 (the "Ordinance") (effective May 7, 2001) (codified as South Salt Lake City, Utah, Code, ch. 5.56 (the "Code")). Under the Ordinance, dancers at the

---

[1]South Salt Lake Chamber of Commerce, *at* http://www.southsaltlakechamber.com.

establishments mentioned above may no longer drop the last stitch. *Id*. §

5.56.3100. The Plaintiffs-Appellants in this case, female dancers who object to

the requirement of wearing "G-strings" and "pasties" during their performances,

brought suit to enjoin the enforcement of the Ordinance, and filed a motion for a

preliminary injunction in district court.

The district court denied their request for a preliminary injunction,

commenting:

> The specific proposition stated by Plaintiffs, that nude dancing is a
> protected form of expression not subject to any limitation, has not
> been passed upon by the 10th Circuit Court of Appeals. It is this
> Court's opinion that if and when they consider this proposition, the
> modest limitations imposed by the ordinance will not be considered a
> burden on expression of erotic dancing in a sexually oriented
> business.

Order Upon Pls.' Mot. for Prelim. Inj. and Def.'s Mot. to Dismiss ("Order"), at 2

(Jan. 29, 2002), App. at 191. In response to a question from Plaintiffs' counsel

regarding what issues would be open in the litigation on the merits, the district

court declined to provide guidance beyond what was said in the ruling on the

preliminary injunction.

The district court's reluctance to elaborate the law applicable to nude

dancing is understandable. Twice in the past fifteen years, the United States

Supreme Court has considered the constitutionality of ordinances banning

commercial nude dancing under the Free Speech Clause, and both times the Court

-3-

produced fractured decisions with no majority opinion and no clear statement of controlling doctrine. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991); *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000). This is because, as discussed below, it is far from clear how prohibitions of nude dancing "fit" within the conceptual structure of First Amendment law.[2] Despite the theoretical uncertainties, however, the results themselves in these cases have been consistent: the practitioners of nude dancing have lost and the ordinances have been upheld.

In their briefs and arguments in this Court, the Plaintiffs devote much of their attention to issues beyond the propriety of the denial of a preliminary injunction. In particular, they argue that they are entitled to trial on certain of their claims, which the Defendants stoutly deny. The procedural posture of this case, however, is not a direct challenge to the Ordinance or even a motion for summary judgment. It is an appeal from the district court's denial of a preliminary injunction against enforcement of the Ordinance. Our appellate review is limited by this posture. *See, e.g.*, *Hawkins v. City & County of Denver*, 170 F.3d 1281, 1292 (10th Cir. 1999) (emphasizing narrow scope of appellate review of denial of a motion for preliminary injunction); *Southwest Voter Reg. Educ. Project v. Shelley*, 344 F.3d 914, 917-18 (9th Cir. 2003) (en banc) (noting

---

[2]The best account of the theoretical difficulties may be found in Vincent Blasi, *Six Conservatives in Search of the First Amendment: The Revealing Case of Nude Dancing*, 33 *Wm. & Mary L. Rev.* 611 (1992).

that appellate review of the denial of a preliminary injunction is "limited and deferential"). The proper means for testing whether a trial is required is for one or both parties to move for summary judgment or judgment on the pleadings. No such motion has been made. The issue before us is simply whether the district court abused its discretion in denying a motion for preliminary relief on this record. The answer to that question is no.

## Background

Under South Salt Lake City's prior Sexually Oriented Business Ordinance, originally enacted in February, 1991, commercial nude dancing was permitted, subject to regulation and licensing. The three establishments at which Plaintiffs work, or wish to work, provided nude entertainment for more than ten years under this licensing scheme. Around 1999, the City Council became concerned about what are called "negative secondary effects" – such as crime, prostitution, and lowered property values – thought to be associated with sexually oriented businesses. For approximately a year, City officials gathered police reports and studies from around the country regarding the connection between sexually oriented commercial business and these secondary effects.

The Ordinance was amended on January 10, 1996, and, after the studies, again on May 2, 2001. As currently formulated, the Ordinance forbids employees

of such businesses[3] to "[a]ppear in a state of nudity before a patron on the premises of a sexually oriented business." Code § 5.56.310, 310(G).[4] The Ordinance also forbids patrons of these establishments to "[a]ppear in a state of nudity before another person on the premises of a sexually oriented business." Code § 5.56.320, 320(C). The Ordinance continues to permit semi-nude commercial dancing; dancers may perform wearing "pasties" and "G-strings." Plaintiffs maintain that these new restrictions violate their freedom of expression under the First Amendment, as applied to state and local governments through the Fourteenth Amendment.

Plaintiffs originally filed this action in the Third Judicial District Court for Salt Lake County, Utah. It was removed to federal district court on May 7, 2001. In their Complaint, filed April 30, 2001, and by motion, Plaintiffs requested a temporary restraining order and preliminary injunction against the enforcement of the Ordinance. The City filed a motion to dismiss on the pleadings.

---

[3] The Code defines a "Sexually oriented business" as "an adult arcade, adult bookstore, adult motion picture theater, adult novelty store, adult theater, adult video store, adult cabaret, and adult motel[,]" each of which is defined in the Code's "Definitions" section. Code § 5.56.050.

[4] The Code defines "[n]udity or state of nudity" as "the showing of the human male or female genitals, pubic area, vulva, anus, or anal cleft with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple." Code § 5.56.050.

The City argued that the Ordinance is justified by the City's interest in curtailing what it found to be the negative secondary effects of establishments featuring totally nude dancing. The targeted secondary effects the City identified included: venereal disease, prostitution, general poor sanitation, criminality, and offenses against minors, among others. *See* Preamble to Ordinance; Ordinance, "Purpose and Findings," (1) – (25). The City based its findings and conclusions on a number of sources cited in the Ordinance, including findings incorporated in decisions of the Supreme Court and this Court, as well as numerous other studies and statistics from the City police department and other municipalities.[5]

---

[5]The cases and studies on which the City relied include the following: *Pap's A.M. v. City of Erie*, 529 U.S. 277 (2000); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986); *Young v. American Mini Theatre, [Inc.]*, 427 U.S. 50 (1976); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991); *California v. La Rue*, 409 U.S. 109 (1972); *O'Connor v City and County of Denver*, 894 F.2d 1210 (10th Cir. 1990); *Z.J. Gifts D-2, L.L.C. v. City of Aurora*, 136 F.3d 683 (10th Cir. 1998); *Dodger's Bar & Grill, Inc. v. Johnson County*, 98 F.3d 1262 (10th Cir. 1996); *Dodger's Bar & Grill, Inc. v. Johnson County Bd. of County Com'rs*, 32 F.3d 1436 (10th Cir. 1994); *American Target Advertising, Inc. v Giani*, 199 F3d 1241 (10th Cir. 2000); *MS News Co. v. Casado*, 721 F.2d 1281 (10th Cir.1983); *Cortese v. Black*, No. 95-1429, 1996 U.S. App. LEXIS 15311 (10th Cir. June 25, 1996); *Salt Lake City v. Wood*, 1999 Utah App. 323, 991 P.2d 595 (Utah Ct. App. 1999); *Salt Lake City v. Roberts*, 7 P.3d 789 (Utah [Ct.] App. 2000); *United States v. Freedberg*, 724 F.Supp. 851 (D. Utah 1989); reports of the South Salt Lake Police Department; and documents concerning the secondary effects occurring in and around sexually oriented businesses, including, but not limited to, Phoenix, Arizona – 1984; Minneapolis, Minnesota – 1980; Houston,

(continued...)

The district court held a hearing on January 3, 2002, on the Plaintiffs' motion for preliminary injunctive relief and the City's motion to dismiss. The only evidence before the district court at the time of the hearing was the Ordinance itself, the preamble of which contained citations to the studies and reports on which the City relied, and affidavits and testimony of four of the Plaintiffs regarding their perceptions of future economic harm that they would suffer absent an injunction. Although the nude dancing establishments, represented by Plaintiffs' counsel, had presented certain contrary studies and evidence to the City Council during its deliberations, Plaintiffs did not submit this

---

[5](...continued)
Texas – 1997; Indianapolis, Indiana – 1984; Amarillo, Texas; Garden Grove, California – 1991; Los Angeles, California – 1977; Whittier, California – 1978; Austin, Texas – 1986; Seattle, Washington – 1989; Oklahoma City, Oklahoma – 1986; Cleveland, Ohio – ; and Dallas, Texas – 1997; St. Croix County, Wisconsin – 1993; Bellevue, Washington – 1998; Newport News, Virginia – 1996; New York Times Square study – 1994; Phoenix, Arizona – 1995-98; and also on findings from the paper entitled "Stripclubs According to Strippers: Exposing Workplace Sexual Violence," by Kelly Holsopple, Program Director, Freedom and Justice Center for Prostitution Resources, Minneapolis, Minnesota, and from "Sexually Oriented Businesses: An Insider's View," by David Sherman, presented to the Michigan House Committee on Ethics and Constitutional Law, Jan. 12, 2000; crime statistics of the City of South Salt Lake for the past seven years; and the Report of the Attorney General's Working Group On The Regulation Of Sexually Oriented Businesses, (June 6, 1989, State of Minnesota).
Ordinance, sec. I(B) ("Findings").

or any other evidence contrary to the City's findings to the district court for consideration on their motion for a preliminary injunction.

In denying both motions from the bench, the district court observed:

> I'll deny the motion for a preliminary injunction. . . .
>
> It would appear to me that the modest effort at limitations provided by the ordinance as enacted by South Salt Lake City requiring the use of G strings and pasties in no way in my opinion limits expression. It would appear to me that expression allowed is at the outer limits that counsel has referred to and that the modest requirements set forth in the ordinance as to semi-nude vers[u]s nude is an appropriate exercise of municipal power.
>
> I think that the issue presented, I hate to say the naked proposition but the specific proposition asserted by counsel for plaintiffs does indeed present an interesting question. That specific proposition as far as I know has never been passed on by the Tenth Circuit but my opinion is that if and when they consider it that the modest limitations imposed by the ordinance will not be considered a burden on expression of erotic dancing in a sexually oriented business establishment.
>
> It would appear to me that the justification set forth in the ordinance as to the secondary questions are legitimate questions for a city to be concerned with and that the modest limitations imposed in no way deprive the artist, the performer, the dancer from expression which is violative of the First Amendment. . . .

Tr. of Hearing dated Jan. 3, 2002 ("Tr."), at 102-04, App. at 184-86.

After the hearing, the district court entered a short order memorializing its observations from the bench. Four of these observations are relevant to our review here:

> 4. The South Salt Lake City ordinance requiring the use of G strings and pasties in sexually oriented businesses does not limit expression.

5.	The modest requirement of the ordinance permitting semi-nudity and prohibiting nudity in sexually oriented businesses is an appropriate exercise of municipal power.

6.	The specific proposition stated by Plaintiffs, that nude dancing is a protected form of expression not subject to any limitation, has not been passed upon by the 10th Circuit Court of Appeals. It is this Court's opinion that if and when they consider this proposition, the modest limitations imposed by the ordinance will not be considered a burden on expression of erotic dancing in a sexually oriented business.

7.	The secondary harmful effects of nudity in a sexually oriented business are concerns that a municipality may legitimately address.

Order at 2, App. at 191. After making these findings, the order memorialized the denial of the motion for preliminary injunction which the district court had made from the bench.

## Analysis

### I.	Standards of Review

We review the district court's decision to deny a preliminary injunction for abuse of discretion. *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1065 (10th Cir. 2001). In doing so, we examine the district court's factual findings for clear error and review its legal determinations de novo. *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002); *see also Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1243 (10th Cir. 2001); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir. 1986). The abuse of discretion standard commands that

we give due deference to the district court's evaluation of the salience and credibility of testimony, affidavits, and other evidence. We will not challenge that evaluation unless it finds no support in the record, deviates from the appropriate legal standard, or follows from a plainly implausible, irrational, or erroneous reading of the record.

*United States v. Robinson*, 39 F.3d 1115, 1116 (10th Cir. 1994) (citation omitted).

It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is "clear and unequivocal." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001); *see also SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).

But while the standard to be applied by the district court in deciding whether a [party] is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance [or denial] of the injunction, in light of the applicable standard, constituted an abuse of discretion.

*Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975).

We must be mindful, therefore, as the Supreme Court has cautioned, that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules. The Federal Rules of Evidence do not apply to preliminary injunction hearings.

*See, e.g.*, *SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 25-26 (1st Cir. 1986); *United States v. O'Brien*, 836 F. Supp. 438, 441 (S.D. Ohio 1993). Thus, as a prudential matter, it bears remembering the obvious: that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits.

II.    Preliminary Injunction Factors

Before a preliminary injunction may be entered pursuant to Fed. R. Civ. P. 65, the moving party must establish that:

> (1) [the movant] will suffer irreparable injury unless the injunction issues; (2) the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood [of success] on the merits.

*Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992); *Kikumura*, 242 F.3d at 955. It is the movant's burden to establish that each of these factors tips in his or her favor. *Id.* However, "[t]he Tenth Circuit has adopted the Second Circuit's liberal definition of the 'probability of success' requirement." *Otero Sav. & Loan Ass'n v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981). Accordingly, we have held that where the moving party has established that the three "harm" factors tip *decidedly* in its favor, the "probability of success requirement" is somewhat relaxed. *Prairie Band*, 253 F.3d at 1246; *Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 781-82

(10th Cir. 1964) (same); *see also, e.g.*, *Boucher v. School Bd.*, 134 F.3d 821, 825 n.5 (7th Cir. 1998). In such cases, "[t]he movant need only show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.'" *Resolution Trust*, 972 F.2d at 1199 (citing *Tri-State*, 805 F.2d at 358); *Otero*, 665 F.2d at 278. However, the Second Circuit has held, and we agree, that "[w]here . . . a preliminary injunction 'seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,' the less rigorous fair-ground-for-litigation standard should not be applied." *Sweeney v. Bane*, 996 F.2d 1384, 1388 (2d Cir. 1993) (quoting *Plaza Health Labs. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)). With this in mind, we consider whether the district court abused its discretion in the present case.

III. Application of Preliminary Injunction Factors: The Equities

A. Irreparable Harm

To constitute irreparable harm, an injury must be certain, great, actual "and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *accord Prairie Band*, 253 F.3d at 1250. Irreparable harm is not harm that is "merely serious or substantial." *Prairie Band*, 253 F.3d at 1250 (quoting *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir. 1976)). "[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence*

-13-

that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (emphasis in original) (brackets, citations, and internal quotation marks omitted). It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1, at 152-53 (2d ed. 1995).

The Plaintiffs presented no evidence that enforcement of the Ordinance during the time it will take to litigate this case in district court will have an irreparable effect in the sense of making it difficult or impossible to resume their activities or restore the status quo ante in the event they prevail. *See*, *e.g.*, *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250 (10th Cir. 2003) (irreparable harm found when there was danger of actual death of eagles and destruction of their breeding grounds if developer were allowed to proceed); *Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929) (irreparable harm found in payment of an allegedly unconstitutional tax when state law did not provide a remedy for its return should the statute ultimately be adjudged invalid). At oral argument, Plaintiffs' counsel asserted that at least one of the establishments had been forced out of business, but no such evidence was presented in district court. In the absence of evidence to the contrary, we assume that Plaintiffs will be able to resume their nude dancing in the event they prevail on the merits. The only

-14-

question, then, is whether the requirement that they wear pasties and G-strings in the meantime is sufficient injury to warrant preliminary injunctive relief.

The Supreme Court has made clear that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *see also Utah Licensed Beverage*, 256 F.3d at 1076 (noting presumption when infringement of First Amendment rights is alleged); *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 & n.2 (10th Cir. 2001); *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999); *Community Communications Co. v. City of Boulder*, 660 F.2d 1370, 1380 (10th Cir. 1981). It is necessary, however, to consider the specific character of the First Amendment claim. The Supreme Court has observed that the requirement that dancers wear G-strings and pasties "is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." *Pap's*, 529 U.S. at 301 (plurality op.); *id.* at 294 ("Any effect on the overall expression [on account of requiring dancers to wear pasties and G-strings] is *de minimis*."). In reliance on *Pap's*, the district court found that the "modest limitations" of requiring G-strings and pasties, would "not be considered a burden on expression of erotic dancing." Tr. at 103, lns. 14-16, App. at 185.

-15-

Thus, while the harm to the Plaintiffs may arguably be imminent and irreparable, it is not "great" or "substantial."

For First Amendment purposes, the important point is that the Plaintiffs are able to convey their chosen message – not that they are able to do so in a state of undress. Appearing nude is not a First Amendment interest in the abstract, but only insofar as nudity is a means by which some message is conveyed. *See Pap's*, 529 U.S. at 289 (plurality op.) ("Being 'in a state of nudity' is not an inherently expressive condition."). The Supreme Court has held – and it stands to reason – that there are "ample" alternative means by which the Plaintiffs' erotic message might be conveyed.

But to say that a harm is "minimal" is not to say it is nonexistent. In the realm of performance art – to which the activity here is at least a distant cousin – the manner of presentation is part of the artistic enterprise. To tell Mahler he could not convey the message of thunder using the kettle drum might leave open ample alternative means for communicating the desired message, but no one would say that the restriction was of no artistic consequence. Because our precedents dictate that we treat alleged First Amendment harms gingerly, we find that this element tips slightly in favor of the Plaintiffs. *See, e.g.*, *Kikumura*, 242 F.3d at 963; *Utah Licensed Beverage*, 256 F.3d at 1076.

B. Balance of Harms

-16-

To be entitled to a preliminary injunction, the movant has the burden of showing that "the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Kikumura*, 242 F.3d at 955. The record is nearly devoid of any finding by the district court regarding the injury to the City of not enforcing the Ordinance during the pendency of the litigation. Presumably, however, the court's conclusion that the harmful secondary effects of nudity in a sexually oriented business are concerns that a municipality may legitimately address has application to the short run as well as the long. Assuming for sake of argument that the Ordinance serves legitimate purposes and ultimately will be sustained, the interests of the City would be injured by postponing the day of its enforcement. In the context of constitutional challenges to Acts of Congress, Chief Justice Rehnquist has stated: "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of applicants in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers); *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers). Although the presumption of constitutionality accorded a municipal ordinance is less than that accorded an Act of Congress, especially in a case involving an explicitly enumerated constitutional right, the ability of a city to

-17-

enact and enforce measures it deems to be in the public interest is still an equity to be considered in balancing hardships. *See Plaza Health Labs.*, 878 F.2d at 580-83.

As with Plaintiffs' claim of hardship, however, the City's interest is less than substantial. Much of the City's professed concern about negative secondary effects arises from sexually oriented businesses in general rather than commercial nude entertainment in particular. The City offers no specific evidence that the requirement of pasties and G-strings will produce a significant incremental improvement with respect to the negative secondary effects. Moreover, the City has tolerated nude dancing establishments for many years, and even after embarking on a different policy took over a year to put the restrictions into effect. This invites skepticism regarding the imperative for immediate implementation.

Thus, the balance of hardships in this case is fairly even: neither party has shown that it will suffer grievous harm if it loses on the preliminary injunction motion.

C.    Public Interest

A movant also has the burden of demonstrating that the injunction, if issued, is not adverse to the public interest. *Kikumura*, 242 F.3d at 955. The Plaintiffs cite the public's interest in ensuring that freedom of expression is not

unconstitutionally curtailed. They also argue that there is a historic value to the businesses where the Plaintiffs work, in which, they contend, the public also has an interest. On the other hand, the democratically elected representatives to the City Council are in a better position than this Court to determine the public interest with respect to questions of social and economic policy. The courts' peculiar function is to say what the law is, not to second-guess democratic determinations of the public interest. In this case, where the Plaintiffs' claim of the public interest is largely a restatement of their own constitutional interest, and the City's claim of public interest is largely a restatement of its own interest in regulating the conduct in question, the "public interest" prong of the preliminary injunction inquiry is nothing more than a restatement of the "balance of hardships" prong. This factor, therefore, also favors neither party.

IV.     Application of Preliminary Injunction Standards: Likelihood of Success on the Merits

The final question before the district court was whether Plaintiffs demonstrated that they were likely to meet their burden of showing that the City's ordinances are facially unconstitutional infringements on their First Amendment rights to expression.

A.     Constitutional Standards: The Appropriate Level of Scrutiny

The First Amendment to the United States Constitution provides that:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.  Since *Gitlow v. New York*, 268 U.S. 652, 666 (1925), the Supreme Court has held that the liberty of expression which the First Amendment guarantees against abridgment by the federal government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action.

The Supreme Court has held that nude dancing "falls only within the outer ambit of the First Amendment's protection." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality op.); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) (plurality op.) (nude dancing "is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so").  The Court has been less clear about the reasons why this is the case.  It has not treated nude dancing as among the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," such as bribery, obscenity, and fighting words, which play "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

Rather, the Supreme Court's analysis of restrictions on nude dancing combines two lines of First Amendment doctrine that, while in principle distinct, have become effectively merged. The first line of doctrine rests on the distinction between "speech" and "conduct." While the Court has recognized that conduct is often expressive in character – burning a flag or sitting in at a segregated lunch counter are well-known examples of expressive conduct – the state has broad latitude to regulate expressive conduct if its interest in doing so is "unrelated to the suppression of free expression," if the regulation furthers "an important or substantial government interest," and if the "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). This line of cases applies here because, as the Court has explained, "[b]eing 'in a state of nudity' is not an inherently expressive condition," yet nude dancing is expressive conduct. *Pap's*, 529 U.S. at 289. The Court has held that a general prohibition on nudity is "unrelated to the suppression of free expression" because such a law prohibits a class of conduct, the act of appearing nude in public, without reference to any element of expression. *Barnes*, 501 U.S. at 566, 570-71.

The second line of doctrine rests on the distinction between the prohibition of certain messages based on their content and the enforcement of reasonable

time, place, or manner restrictions – such as requiring that street demonstrations occur at times other than rush hour, that billboards be located away from scenic highways, or that sound trucks not exceed a certain decibel level. *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981); *Kovacs v. Cooper*, 336 U.S. 77 (1949). Such regulations warrant relatively relaxed, or "intermediate," scrutiny not only if they are "content neutral" in the classic sense, but also if the government's regulatory purpose is not based on the communicative impact of the speech. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445-47 (1992) (Kennedy, J., concurring).

In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Court noted that a zoning ordinance which attempted to locate theaters featuring "adult" films was "content based" to the extent that it identified the regulated activity by the content of the films shown. *Id.* at 47. Focusing on the purpose of the regulation, however, the Court determined that it merely aimed to impose time, place, or manner restrictions on account of the theaters' "secondary effects," meaning effects other than communicative impact on the audience. *Id.* "The ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life, not

to suppress the expression of unpopular views." *Id.* at 48 (internal quotation marks and brackets omitted). The Court thus carved out a category of speech regulations that are "content-neutral" not because they apply to conduct on a generally applicable basis without regard to expressive content, but because the *regulatory purpose* is unrelated to that content. In *Ward v. Rock Against Racism*, the Court stated that "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." 491 U.S. 781, 791 (1989). This Court has held that restrictions based on the negative secondary effects of sexually oriented businesses are "content-neutral" in this sense. *Z-J Gifts D-2, L.L.C. v. City of Aurora*, 136 F.3d 683, 686 (10th Cir. 1998).

The principal conceptual distinction between the two lines of doctrine is that the former – the "*O'Brien* test" – applies to generally applicable regulations of both non-expressive and expressive conduct, not targeting or singling out expressive conduct, while time, place, or manner regulations can be directed specifically at expression (such as billboards or street demonstrations), so long as the governmental purpose is unrelated to disagreement with the message and there are adequate alternative channels of communication.

In *Pap's*, a majority of the Court held that general prohibitions on public nudity, including commercial nude dancing, are subject to scrutiny "under the

-23-

framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech." 529 U.S. at 289 (plurality op. per O'Connor, J., joined by Rehnquist, C.J., and Kennedy and Breyer, JJ.); *id.* at 310 (Souter, J., concurring). The Court also, however, relied heavily on the *Renton* line of cases. *Id.* at 295-96 (plurality op.); *id.* at 312-13 (Souter, J., concurring). The resulting doctrine thus seems to be a combination of the two lines of cases.

This case does not involve a general prohibition on public nudity, like that in *Barnes* and *Pap's*. Rather, it is a more narrowly tailored ban on nudity of either employees or patrons within sexually oriented businesses. Accordingly, it might be argued that the case is most accurately analyzed as a "manner" regulation. This would seem to have been the Court's point in *Pap's* when it noted: "The public nudity ban certainly has the effect of limiting one means of expressing the erotic message being disseminated at Kandyland. But simply to define what is being banned as the 'message' is to assume the conclusion." 529 U.S. at 292-93. *See also Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1308 (11th Cir. 2003) (applying *Pap's* and treating the G-string and pasties requirement as a "manner" restriction). Nudity, after all, is not a message in itself, but is a mode of conveying any number of different messages. It can be humorous (as when "Hotlips" Houlihan is exposed in the movie *M\*A\*S\*H*); it can be dehumanizing (as in the registration scene in *Schindler's List*); it can be

-24-

an act of self-affirmation (as in *The Full Monty*); it can symbolize

unrighteousness (as in the Book of *Hosea*); it can symbolize innocence (as in

Botticelli's *Birth of Venus*), or the loss of innocence (as in the movie *The Last

Picture Show*); it can convey cruelty or disgust or freedom or – as Plaintiffs

claim as their message – eroticism.[6]  Often nudity is not communicative at all.

By banning nudity in sexually oriented businesses, South Salt Lake City has not

precluded the expression of any particular set of ideas, but has prohibited one

particular manner of conveying those ideas, which the City Council is convinced

has negative secondary effects.

---

[6]We are not troubled by the fact that this reasoning runs counter to Marshall McLuhan's iconic dictum that "the medium is the message."  Marshall McLuhan, *Understanding the Media: The Extensions of Man* 23-35 (1964).  Whatever might have been its merits in its own pop cultural context, McLuhan's dictum is incompatible with the basic thrust of modern First Amendment law, in which distinctions based on content ('the message") are subject to a different mode of analysis than distinctions based on time, place, or manner ("the medium").  *See* Geoffrey R. Stone, *Content-Neutral Restrictions*, 54 *U. Chi. L. Rev.* 46 (1987); *Content Regulation and the First Amendment*, 25 *Wm. & Mary L. Rev.* 189 (1983).  That would be nonsensical if the medium really were the message.  Other scholars have long maintained that media, or modes of expression, do not inherently convey a particular meaning, but generate meaning through the way they are used in particular settings.  *See, e.g.*, John Dewey, *Art as Experience* 60-64 (Perigree, 1980) (1934); Stanley Fish, *Is There a Text in This Class? The Authority of Interpretive Communities* 317-18 (1980); Clifford Geertz, *Local Knowledge: Further Essays in Interpretive Anthropology* 119 (1983) ("It is, after all, not just statues (or poems or paintings) that we have to do with but the factors that cause these things to seem important – that is, affected with import – to those who make or possess them, and these are as various as life itself.").

In one important sense, the South Salt Lake Ordinance is less constitutionally problematic than the general public nudity bans upheld in *Barnes* and *Pap's*: it is more narrowly tailored. In *Barnes* and *Pap's*, there was dispute regarding the applicability of the prohibitions to legitimate theater or dance involving nudity, such as the plays *Equus* or *Hair* or the ballet *Salome*. The broad sweep of the public nudity prohibition seemed to present a dilemma: either the prohibition would apply to such performances and thus appear overbroad, or it would not apply and thus appear to be administered in a content-discriminatory manner. By limiting its nudity ban to sexually oriented businesses – a classification that itself is "content-neutral" within the meaning of this Court's cases, *see Z-J Gifts*, 136 F.3d at 686-87 – the City here has avoided both horns of the dilemma.

We turn now to Plaintiffs' arguments that the district court abused its discretion in finding that they had not demonstrated a likelihood of success on the merits.

B.    Plaintiffs' Arguments for Heightened Scrutiny

Plaintiffs argue against application of the relatively relaxed standard of review employed in *Barnes* and *Pap's.* They point out that *Barnes* and *Pap's* involved general prohibitions on public nudity, while the South Salt Lake Ordinance bans nudity only within sexually oriented businesses. Accordingly,

-26-

they argue that the South Salt Lake Ordinance is subject to strict scrutiny as a "content-based" restriction on speech. Their argument finds some support in two district court decisions, *Nakatomi Investments, Inc. v. City of Schenectady*, 949 F. Supp. 988, 998-99 (N.D.N.Y 1997), and *Books, Inc. v. Potawatamie County*, 978 F. Supp. 1247, 1257 (S.D. Iowa 1997). But the argument – or at least the ultimate conclusion – has also been rejected by the only two courts of appeals to consider it. *Schultz v. City of Cumberland*, 228 F.3d 831, 846-47 (7th Cir. 2000); *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1306-10 (11th Cir. 2003).

We reject Plaintiffs' argument for two independent reasons. First, the narrower scope of the South Salt Lake Ordinance, as compared with the general public nudity prohibitions of *Barnes* and *Pap's*, does not necessarily make the Ordinance "content-based." The prohibition is still on a form of conduct, and unless the category of businesses to which it applies is defined by their expressive content, the Ordinance remains "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377. Plaintiffs inform us that "[t]he ordinance at issue here applies only to adult businesses featuring nude dancing as expressive conduct," Appellants' Br. at 16, but they point to nothing in the Ordinance that supports that interpretation. On its face, the Ordinance applies to all "sexually oriented businesses," which include establishments such as "adult

motels" and "adult novelty stores," which are not engaged in expressive activity. Although the "sexually oriented business" category certainly encompasses some expressive activities – adult cabarets and theaters, for example – this does not mean that the Ordinance targets them. The nudity ban applies across the board to all sexually oriented businesses, expressive and non-expressive alike. It is typical of conduct restrictions evaluated under *O'Brien* to include some expressive, as well as some non-expressive, activities within their reach. Where, as here, expressive activities are not singled out for special regulation, *O'Brien* applies. *See Alameda Books*, 535 U.S. at 447 (Kennedy, J., concurring) (justifying application of lesser scrutiny to an ordinance that "is not limited to expressive activities [but] extends, for example, to massage parlors"); *Z-J Gifts*, 136 F.3d at 686-87 (holding that an ordinance restricting sexually oriented business is content-neutral within the meaning of *Renton*).

Second, even if the South Salt Lake Ordinance must be distinguished from that in *Barnes* and *Pap's*, and cannot be justified as a generally applicable regulation of conduct, it still is subject to no more than intermediate scrutiny under the *Renton* line of cases, because the governmental purpose is based on the secondary effects of nudity in sexually oriented businesses rather than on disagreements with the content of the message. *Schultz*, 228 F.3d at 845-46. To be sure, as Plaintiffs point out, the ordinance upheld in *Renton* was a restriction

on the locations within the city in which the sexually oriented businesses could locate, rather than, as here, a restriction on the manner in which they are permitted to operate.  But we think Plaintiffs are wrong to characterize this as a "total ban" on the speech.  Plaintiffs are not prohibited from communicating their supposedly erotic message through dance; they are merely prohibited from doing so in a state of total nudity.  *See Fly Fish*, 337 F.3d at 1307-08.

In *Pap's*, the plurality explicitly rejected the dissent's characterization of a nudity prohibition as a "complete ban on expression."  529 U.S. at 292 (plurality op.).  The plurality explained: "The public nudity ban certainly has the effect of limiting one particular means of expressing the kind of erotic message being disseminated. . . .  But simply to define what is being banned as the 'message' is to assume the conclusion."  *Id.* at 292-93.  Indeed, the plurality found that "[a]ny effect on the overall expression is *de minimis*."  *Id.* at 294.  Thus, far from being a "complete ban," the plurality found that the prohibition on nudity had a "*de minimis*" effect on the performers' ability to convey their desired message.  *Id.*; *see also Schultz*, 228 F.3d at 847 (concluding that a requirement that dancers in sexually oriented businesses wear pasties and G-strings does not violate the First Amendment).

The fallacy in Plaintiffs' argument is to assume that the "adequate alternative avenues of expression" required under the *Renton* line of cases refers

exclusively to location. Time, place, or manner regulations all are partial limitations, but each is partial in a different way. "Place" limitations require alternative locations; "time" limitations require alternative times; and "manner" limitations require alternative ways in which a message may be communicated. A ban on nudity within sexually oriented businesses is a "manner" regulation, *Fly Fish*, 337 F.3d at 1308-09, and Plaintiffs have provided no reason to believe that there do not exist other ways to get their message across. *See Pap's*, 529 U.S. at 301 ("the requirement that dancers wear pasties and G-strings . . . leaves ample capacity to convey the dancer's erotic message."); *Schultz*, 228 F.3d at 847 (same). While "there may be cases in which banning the means of expression so interferes with the message that it essentially bans the message, that is not the case here." *Pap's*, 529 U.S. at 293; *Fly Fish*, 337 F.3d at 1308.

C.    Plaintiffs' Argument Regarding Evidence of Secondary Effects and the Record Before the District Court

Plaintiffs complain vigorously regarding the supposed inadequacy of the factual record in this case to support the City's claim that the Ordinance is justified by the need to control the negative secondary effects of commercial nude dancing. Indeed, they assert that "[t]here is no evidence that such effects have occurred, or are in imminent danger of occurring, in South Salt Lake. Plaintiffs believe that all evidence is to the contrary." Appellants' Br. at 24. However, as counsel conceded at oral argument before this Court, at the hearing

-30-

in the district court on their motion for preliminary injunctive relief, the Plaintiffs did not present any evidence in support of their position. In their briefs in this Court, Plaintiffs refer to various studies that they submitted to the City Council, but did not trouble to present to the district court, and to other evidence that they submitted in unrelated litigation in state court, but likewise did not see fit to introduce below. *See* Appellants' Br. at 24-26. Under these circumstances, it is obvious that the district court did not abuse its discretion in denying their motion. Plaintiffs simply had not met their burden of showing that their right to relief was "clear and unequivocal." *Kikumura*, 242 F.3d at 955.

We turn, nevertheless, to the four elements of intermediate scrutiny, as set forth in *O'Brien*,[7] to determine whether the district court abused its discretion in concluding, on this one-sided record, that Plaintiffs did not have a substantial likelihood of success on the merits. Under intermediate scrutiny, a restriction on speech must: (1) be within the constitutional power of government to adopt; (2) further an important or substantial governmental interest; which (3) is unrelated to the suppression of expression; and (4) be no greater restriction on First

---

[7] The elements of intermediate scrutiny for time, place, or manner regulations are only slightly different. In such a case, we ask simply whether the regulation is "narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293.

Amendment freedom than is essential to furtherance of the government's

purpose. *O'Brien*, 391 U.S. at 377; *Pap's*, 529 U.S. at 296, 301.

There is no doubt that the Ordinance is within the lawful powers of South

Salt Lake City. *See Pap's*, 529 U.S. at 296 (the city's "efforts to protect public

health and safety are clearly within the city's police powers").

The second factor is probably the most important and contested. To survive

intermediate scrutiny, the government must be able to demonstrate that the

challenged speech restriction serves a "substantial governmental interest."

*O'Brien*, 391 U.S. at 377. The burden of proof is on the government to

"demonstrate that the recited harms are real, not merely conjectural, and that the

regulation will in fact alleviate these harms in a direct and material way."

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).[8] On the other hand,

the Court has repeatedly emphasized that "municipalities must be given a

'reasonable opportunity to experiment with solutions' to address the secondary

---

[8] It is not obvious that intermediate scrutiny cases from other contexts are necessarily applicable to nude dancing or other sexually oriented speech, in light of the Court's position that "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate." *Barnes*, 501 U.S. at 584 (Souter, J., concurring) (quoting *Young*, 427 U.S. at 70). Nonetheless, the Court's recent decisions in the context of sexually explicit speech confirm that the government bears the burden of providing evidence of secondary effects, where it relies on those secondary effects as the justification for restricting speech. *See Alameda Books*, 535 U.S. at 437 (plurality op.).

effects of protected speech." *Alameda Books*, 535 U.S. at 439, *quoting Renton*, 475 U.S. at 52, *quoting Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976) (plurality op.) (internal quotation marks omitted).  The standards for the quantity and nature of the empirical evidence needed to uphold a city ordinance based on the negative secondary effects of sexually oriented speech in general, or nude dancing in particular, are continuing to evolve.

In *Renton*, a six-Justice majority of the Supreme Court held that "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem the city addresses."  475 U.S. at 51-52.  Accordingly, it is common in these cases for cities to cite and rely on seemingly pre-packaged studies, as well as the findings of courts in other cases.  Here, South Salt Lake invoked a typical set of such studies and findings in support of its Ordinance.

In *Barnes*, the three-Justice plurality (Chief Justice Rehnquist, joined by Justices O'Connor and Kennedy) sustained a prohibition on public nudity, as applied to nude dancing, on the basis of the "substantial government interest in protecting order and morality," without the need for any empirical evidence regarding secondary effects.  *Barnes*, 501 U.S. at 569 (plurality op.).  Justice

Scalia concurred on the ground that a general public nudity prohibition "is not subject to First Amendment scrutiny at all." *Id.* at 572 (Scalia, J., concurring). The decisive fifth vote was cast by Justice Souter, whose opinion is controlling under the rule of *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation marks omitted)). Justice Souter concluded, contrary to the plurality, that the city was required to show secondary effects of the sort canvassed in *Renton*, and not merely an interest in order and morality. *Barnes*, 501 U.S. at 583-86 (Souter, J., concurring). But he maintained that it was not necessary for cities to "litigate this issue repeatedly in every case," and thus that previous court findings in *Renton* and other cases provided sufficient evidentiary support. *Id.* at 584.

In *Pap's*, a four-Justice plurality (Justice O'Connor, joined by the Chief Justice, Justice Kennedy, and Justice Breyer) voted to uphold a general public nudity ban almost identical to that upheld in *Barnes*, but did so on the basis of secondary effects. The Court emphasized that the city did not have to produce new studies and was permitted to rely on the evidentiary foundation in earlier cases. *Pap's*, 529 U.S. at 296-97. The Court also treated the judgments of city

council members regarding the need for the ordinance as evidence. "The city council members, familiar with commercial downtown Erie, are the individuals who would likely have had firsthand knowledge of what took place at and around nude dancing establishments in Erie, and can make particularized, expert judgments about the resulting harmful secondary effects." *Id.* at 297-98. Indeed, the Court observed that "*O'Brien*, of course, required no evidentiary showing at all that the threatened harm was real." *Id.* at 299; *see also id.* at 298 ("On this point, *O'Brien* is especially instructive. The Court there did not require evidence that the integrity of the Selective Service System would be jeopardized. . . ."). The plurality also noted that the plaintiffs had "ample opportunity to contest the council's findings about secondary effects – before the council itself, throughout the state proceedings, and before this Court," but had failed to do so. *Id.* at 298. "In the absence of any reason to doubt it," the plurality stated, "the city's expert judgment should be credited." *Id.*

Two Justices concurred on the ground that a regulation of conduct is unconstitutional only where the "government prohibits conduct precisely because of its communicative attributes," making it unnecessary to inquire into the empirical basis for the secondary effects justification (about which these Justices were skeptical). *Id.* at 310 (Scalia, J., joined by Thomas, J., concurring). Accordingly, under the rule of *Marks*, the plurality opinion constitutes the

-35-

holding of the Court. This suggests that the City's initial burden to present empirical support for its conclusions is minimal, but that plaintiffs must have an opportunity to present their own evidence, to which the city is then entitled to respond.

In *Alameda Books*, the Court granted certiorari to "clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton*." 535 U.S. at 433. Again, however, the Court failed to produce a majority opinion. The four-Justice plurality (Justice O'Connor, joined by the Chief Justice, Justice Scalia, and Justice Thomas) reaffirmed the basic approach taken in *Renton* and *Barnes*. The Court explained that "the city certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects," but it did not require the city to "bear the burden of providing evidence that rules out every theory for the link between concentrations of adult establishments that is inconsistent with its own." *Id.* at 437. The plurality distinguished between two parts of the *Renton* intermediate scrutiny framework: whether an ordinance is content-neutral and whether it serves a substantial governmental interest while leaving open alternative avenues of communication. Only with regard to the latter would the courts "examine evidence concerning regulated speech and secondary effects." *Id.* at 440-41.

Even as to that connection, the plurality reiterated that the Court had "refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech." *Id.* at 438. It stated that cities are entitled to rely, in part, on "appeal to common sense," rather than "empirical data," at least where there is no "actual and convincing evidence from plaintiffs to the contrary." *Id.* at 439. In so holding, the *Alameda* plurality provided the following observation regarding the deference properly accorded to legislative findings under the second prong of the *O'Brien* test:

> This is not to say that the municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id.* at 438-39 (citing *Pap's*, 529 U.S. at 298). The plurality described its "deference to the evidence presented by the city" as "the product of a careful balance between competing interests." *Alameda*, 535 U.S. at 440. On the one hand, courts have an obligation to exercise independent judgment in First Amendment cases, but on the other hand the plurality acknowledged "that the

Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems." *Id.*

Justice Kennedy concurred separately. However, he did not criticize the plurality's approach to the evidence necessary to support a secondary effects justification. If anything, Justice Kennedy's comments on that issue appear somewhat more deferential to the cities: "As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners." *Id.* at 451 (Kennedy, J., concurring). "The Los Angeles City Council knows the streets of Los Angeles better than we do. . . . It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion." *Id.* at 452.

Applying these precedents, we cannot say that the district court abused its discretion in concluding that the Plaintiffs failed to show a likelihood of success on the merits. The evidentiary record compiled by South Salt Lake City is similar to the record on which the Court affirmed the ordinance in *Pap's*. Presumably, the City Council of South Salt Lake is entitled to as great a degree of deference as that of any other. The Plaintiffs failed to submit any evidence in district court that might call the City's empirical judgments into question. Without "actual and convincing evidence from plaintiffs to the contrary,"

*Alameda Books*, 535 U.S. at 439 (plurality op.), there was no reason for the district court to inquire any further.

The third *O'Brien* factor, that the government interest is unrelated to the suppression of free expression, follows from the second. As explained above, from *Renton* onward, the Court has consistently held that the control of negative secondary effects, such as those invoked by South Salt Lake City, is unrelated to the suppression of free expression.

Finally, the district court did not abuse its discretion in concluding that the Ordinance satisfies the fourth and final *O'Brien* factor – that the restriction is no greater than is essential to the furtherance of the government interest – for the same reason that factor was satisfied in *Pap's*: the requirement that dancers wear "G-strings" and "pasties" has a "*de minimis*" effect on their ability to communicate their message. *Pap's*, 529 U.S. at 301 ("The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message."). Plaintiffs evidently disagree with that conclusion, but offer no basis for distinguishing the Supreme Court's conclusion.

In summary, as the case is now postured, the Plaintiffs put on no evidence before the district court to establish a likelihood that *O'Brien* factors two, three and four favored their case on the merits. Because they failed to put on such

evidence, the Plaintiffs have not demonstrated a substantial likelihood of success on the merits.

## Conclusion

For the foregoing reason, the decision of the district court denying the Plaintiffs' motion for preliminary injunction is AFFIRMED. However, because the record before us is very limited, we note specifically that we express no opinion on the ultimate merits of this case. Plaintiffs' motion to supplement the record with materials not before the district court is DENIED.