**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 10, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DOCTOR JOHN'S, INC., a Utah
Corporation; and JOHN HALTOM,

      Plaintiffs - Appellants,

v.

CITY OF ROY; G. BLAKE
WAHLEN, in his official capacity as
City Manager; and TAMMY
NELSON, in her official capacity as
Development Services Manager,

      Defendants - Appellees.

No. 04-4270

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 1:03-CV-00081-PC)**

---

W. Andrew McCullough, McCullough & Associates, LLC, Midvale, UT (Michael
W. Gross, Schwartz & Goldberg, PC, with him on the briefs), for Plaintiffs -
Appellants.

Robert C. Keller (Jody K. Burnett, with him on the brief), Williams & Hunt, Salt
Lake City, UT, for Defendants - Appellees.

---

Before **HENRY**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

**EBEL**, Circuit Judge.

Plaintiff-Appellant Dr. John's, Inc. ("Dr. John's") operates stores that sell, among other things, a range of "adult" products. After Dr. John's located a store within its city limits, Defendant-Appellee Roy City ("Roy City" or "City") passed an ordinance subjecting "sexually oriented businesses" to certain regulations. Dr. John's challenged this ordinance on a variety of constitutional grounds; the district court rejected them all. We agree with the majority of the district court's rulings, and thus AFFIRM in substantial part. However, one of the issues before the district court was whether the ordinance was properly supported as targeting the untoward "secondary effects" adult businesses are thought to produce. It is unclear from the record what evidence supporting and countering the City's rationale that the ordinance was indeed necessary to prevent these negative effects was presented to, and considered by, the district court. We therefore REMAND this case for consideration of that issue.

### BACKGROUND

Dr. John's stocks a variety of "adult" products, ranging from swimwear and lingerie to "marital aids" to sexually-explicit books and videos. In February 2001, Dr. John's applied for and received a general business license to operate a store in Roy City. Plaintiff-Appellant John Haltom, a major shareholder in Dr. John's parent company, is also involved in the operation of Dr. John's Roy City store.

Soon after Dr. John's came to Roy City, the City adopted an ordinance requiring "sexually oriented businesses" ("SOBs") and their employees to follow certain regulations. The ordinance's stated purpose is "to regulate sexually oriented businesses in order to promote the health, safety, morals, and general welfare of the citizens of the City, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses within the City." The ordinance also sets forth findings demonstrating the need for the regulations, which are based on case law, Congressional testimony, research papers, and various studies from other areas about the secondary effects of SOBs.

The ordinance provides that SOBs and their employees must obtain licenses in order to operate in the City. The license application requires the applicant's name, address, proof of age, whether the applicant or the business has had a previous SOB license suspended or revoked, and whether the applicant has been convicted of or pled guilty to certain "specified criminal activities." If the application is for a business license (rather than an employee license), the applicant must also provide the business name, location, and contact information; the name of the agent authorized to receive service of process; and a sketch of the layout of the premises.

Upon the filing of a completed application, the City is to issue immediately a temporary license to the applicant; a permanent license is thereafter issued unless the applicant: is under 18; failed to provide information or provided false information on the application form; failed to pay the application fee; was convicted of a "specified criminal activity"; refused an inspection of an SOB's premises by the City within the preceding year; or had an SOB license revoked within the preceding year. If the application is for a business license (as opposed to an employee license), the application may also be denied if the premises do not conform to the sketch of the layout of the premises submitted with the application.

The ordinance subjects SOBs to various rules and regulations. Applicants must pay an initial application fee and an annual renewal fee; the fees are set by the City Council and may not exceed $200 initially/$100 annually for an SOB license or $100 initially/$50 annually for an SOB employee license. Additionally, an SOB's operating hours are limited to between 10:00 am and 11:00 pm, the business must post and enforce a no-loitering policy, and there must be appropriate lighting around the exterior of the premises.

Under the ordinance, SOBs are classified into eight categories. The City contends that Dr. John's falls into category 2—"adult bookstores, adult novelty stores, adult video stores." The ordinance defines a category 2 business as stores

with a "significant or substantial portion" of their stock or floor space or revenue devoted to or deriving from adult media (e.g., books, magazines, videos) or adult "toys."

In December 2002, the City presented Dr. John's with a copy of the ordinance and the application materials. Instead of completing the SOB application, Dr. John's sought renewal of its general business license and sent the City a letter stating that it had reviewed the ordinance and did not believe it fell under the definition of an SOB. The letter also explained that a case pending in the Utah Supreme Court—Midvale City v. Haltom—dealt with a similar SOB ordinance as applied to another Dr. John's store, and that Dr. John's felt the resolution of that case would "answer the questions" of whether it would need an SOB license to do business in the City. The letter suggested that the City delay any action against Dr. John's pending the outcome of Midvale.

In May 2003, the Utah Supreme Court decided Midvale and ruled against Dr. John's. See Midvale City Corp. v. Haltom, 73 P.3d 334 (Utah 2003). Even so, Dr. John's again refused to complete the Roy City SOB application and instead filed the present case pursuant to 42 U.S.C. § 1983, alleging that the City's ordinance was an unconstitutional restriction on speech. The City counterclaimed, seeking a court order requiring Dr. John's to comply with the ordinance.

Both sides then moved for summary judgment, with the City arguing that Dr. John's challenge should be dismissed and that it should be ordered to comply with the ordinance, and Dr. John's urging that the ordinance be declared unconstitutional. The district court considered and rejected Dr. John's arguments as to the ordinance's unconstitutionality, and therefore entered judgment in the City's favor on this issue. The court then turned to the City's request for an order requiring Dr. John's to comply with the ordinance, which turned on whether Dr. John's met the ordinance's definition of an SOB. Noting that this was an issue of state law, the court declined to exercise jurisdiction over this issue and thus denied the City's motion for summary judgment on this point.[1]

Dr. John's then filed a motion to amend the district court's judgment, asking the court to construe the ordinance's "significant or substantial" language by specifying a percentage of inventory or floorspace or revenue that would determine whether or not a particular business was an SOB. The district court declined to do so, and this appeal followed.

## DISCUSSION

We review the district court's decisions on motions for summary judgment de novo, applying the same legal standard used by the district court. Gregory v. Fort Bridger Rendezvous Ass'n, 448 F.3d 1195, 1199 (10th Cir. 2006). Summary

---

[1] The City does not appeal this decision.

judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## I. Constitutional Standing

"Standing . . . raises jurisdictional questions and we are required to consider the issue sua sponte to ensure that there is an Article III case or controversy before us." Rector v. City and County of Denver, 348 F.3d 935, 942 (10th Cir. 2003) (quotations omitted). The doctrine of standing limits who may bring a matter before the federal courts for adjudication. The "irreducible constitutional minimum of standing" requires plaintiffs to show (1) that they have suffered an "injury in fact," (2) that the injury is "fairly traceable to the challenged action of the defendant," and (3) that the injury is likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (quotations, alterations omitted). Where, as here, the proceedings have reached the summary judgment stage, the plaintiff bears the burden of setting forth (by affidavit or other evidence) specific facts that, if proved, would establish these elements. Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005).

An injury in fact does not automatically occur by "[t]he mere presence on the statute books of an unconstitutional statute . . . , even if [plaintiffs] allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006). Where a law has yet to be enforced against the plaintiff, the plaintiff is further required to show a "credible threat" of enforcement. Id.; see also Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1229 (10th Cir. 2005) ("[A] plaintiff establishes standing when a credible threat of prosecution or other consequences following from the statute's enforcement is shown.") (quotation omitted).

Dr. John's concedes in its opening brief that, at the time this suit was filed,[2] the ordinance had not been enforced against it. However, the City has plainly indicated that it intends to require Dr. John's compliance; following the Utah Supreme Court's Midvale decision, the City wrote to Dr. John's that it must complete the required SOB applications "or appropriate legal action will be commenced." Dr. John's faces the choice between the proverbial rock and a hard place. If, on the one hand, Dr. John's should accede to the City's demand and apply for an SOB license, the record contains evidence of the burdens that would befall it. For example, Dr. John's store manager stated that registration as an

---

[2] "Standing is determined as of the time the action is brought." Nova Health Sys., 416 F.3d at 1154.

- 8 -

SOB would lead to "a daily closing of the business during certain hours," and John Coil, a senior official with Dr. John's, testified that the requirement that every employee be licensed creates difficulty for the company. If, on the other hand, Dr. John's refuses to apply for a license, it faces fines of up to $2,500 per day; the ordinance further authorizes the City "to institute criminal or civil proceedings necessary for" its enforcement. Thus, Dr. John's has met the injury-in-fact requirement. Cf. Aid for Women v. Foulston, 441 F.3d 1101, 1111 n.10 (10th Cir. 2006) (noting that plaintiff's "'if . . . then,' approach to injury, (i.e., if we don't follow the [Attorney General's] interpretation [of a statute], then we face prosecution, but if we do follow it, then we will harm our patients' and clients' constitutional rights)" was sufficient to show injury-in-fact "if Plaintiffs would be injured whether they follow the [Attorney General's] interpretation or not.").

Given this injury-in-fact, causation and redressabilty are also established. The injury is plainly caused by the City's passage of the ordinance and credible threat to enforce it. Further, the injury would be redressed by a declaration that the ordinance is unconstitutional and an injunction against its enforcement. We therefore conclude that Dr. John's has constitutional standing to challenge the ordinance's constitutionality.

## II. Merits

Dr. John's attacks the ordinance's constitutionality on several fronts, claiming that: (1) it is unconstitutionally vague and thus void on its face; (2) it gives the City "unbridled discretion" over who must obtain an SOB license and thus operates as an unconstitutional prior restraint; (3) it is not a valid "time-place-manner" restriction on speech because it is not narrowly tailored to regulate only businesses that produce adverse "secondary effects"; (4) the provision denying an SOB employee license to persons convicted of certain crimes operates as a prior restraint on those individuals' exercise of their First Amendment rights; and (5) it infringes on customers' rights to privacy in their purchase of "marital aids."

**A. Vagueness**

As a basic matter of due process, a law is "void for vagueness" if it does not clearly define its prohibitions. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). Where a law deals with areas of First Amendment import, there is the additional concern that the uncertain terms will inhibit those First Amendment freedoms, as "citizens [will] steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." Id. at 109 (quotations, alterations omitted). Thus, in the First Amendment context, "[s]tricter standards of permissible statutory vagueness may be applied." Hynes v. Mayor and Council of Borough of Oradell, 425 U.S. 610, 620 (1976).

The district court rejected Dr. John's facial vagueness challenge,[3] finding that Dr. John's lacked prudential and constitutional[4] standing to raise this claim. While we disagree as to this conclusion, we nonetheless affirm the district court on the ground that the ordinance is not vague on its face.

## 1. Prudential Standing

The district court found, and the City argues on appeal, that Dr. John's lacked standing to bring a facial vagueness challenge. Here, it is clear the Roy City ordinance might be unconstitutional as applied to Dr. John's, so that it has standing on its own.

## 2. Facial vagueness

"Facial challenges are strong medicine," and thus we "must be vigilant in applying a most exacting analysis to such claims." Ward v. Utah, 398 F.3d 1239, 1246-47 (10th Cir. 2005). Though perhaps "efficient in the abstract," facial challenges risk "losing the lessons taught by the particular." Sabri v. United States, 541 U.S. 600, 609 (2004). It is for this reason that a party must show, at a

_____

[3] At oral argument, Dr. John's claimed that it challenged the ordinance as vague both facially (i.e., vague as to everyone) and as applied (i.e., vague as to Dr. John's). However, the district court's order considered and addressed only a facial vagueness challenge. On appeal, Dr. John's does not argue that this was erroneous. Based upon our review of the complaint below and Dr. John's briefing on appeal, we conclude that it is raising only a challenge of facial vagueness and, accordingly, that is the issue we address.

[4] We have addressed, in the previous section of this opinion, the constitutional standing issue. Here, we address only the prudential standing issue.

minimum, that the challenged law would be vague in the vast majority of its applications; that is, that "vagueness permeates the text of [the] law." City of Chicago v. Morales, 527 U.S. 41, 55 (1999).[5]

The ordinance specifically defines an adult bookstore/novelty store/video store as

> a commercial establishment which has significant or substantial portion of its stock-in trade or derives a significant or substantial portion of its revenues or devotes a significant or substantial portion of its interior business or advertising, or maintains a substantial section of its sales or display space to [sic] the sale or rental, for any form of consideration, of any one or more of the following:
>
> 1. Books, magazines, periodicals or other printed matter, or photographs, films, motion pictures, video cassettes, compact discs, slides, or other visual representations which are characterized by their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas;

---

[5] The Supreme Court has been less than clear as to what a party must show in order to succeed on a facial vagueness challenge. Compare United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.") (emphasis added), with Morales, 527 U.S. at 55 n.22 (1999) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the . . . formulation [announced in Salerno], which has never been the decisive factor in any decision of this Court, including Salerno itself . . . . Since we . . .conclude that vagueness permeates the ordinance, a facial challenge is appropriate.") (emphasis added).

In any event, whether a party bringing a facial vagueness challenge must show vagueness in all of a statute's applications or merely vagueness in the vast majority of its intended applications, we conclude that Dr. John's facial challenge fails.

- 12 -

2.     Instruments, devices, or paraphernalia which are designed for use or marketed primarily for stimulation of human genital organs or for sadomasochistic use or abuse of themselves or others.

Dr. John's challenges two provisions of this definition: (1) the term "significant or substantial portion" (the "quantity" test); and (2) the term "characterized by their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas" (the "quality" test).

### a. "Significant or substantial"

A statute is unconstitutionally vague for one of two reasons: it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits"; or it "authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000). In the context of Dr. John's facial challenge—where these concerns would have to be present in at least the vast majority of cases—we cannot conclude that the quantity test language is impermissibly vague.

Although there may be instances where an adult bookstore would be unsure of whether its stock, floorspace, or revenue is made up of a "significant or substantial portion" of adult material, there are myriad instances in which it would not. If, for example, Victoria's Secret sold a few copies of an adult magazine along with its regular stock of lingerie, it certainly would not wonder if the ordinance applied to it. Or, if a store chose to carry nothing but adult videos and toys, it would have no doubt that it was required to obtain an SOB license to

- 13 -

do so.  In short, in many situations, "people of ordinary intelligence" would clearly understand whether or not the ordinance applied to them.

In the same way, in many cases the ordinance cannot be said to permit arbitrary enforcement.  The City has announced a standard—it will not require a business to obtain an SOB license unless it stocks a "significant or substantial" amount of adult material.  Although this standard gives officials some discretion over which businesses they deem to qualify as SOBs, it does not vest the sort of "virtually complete discretion" that has formed the basis for facial vagueness attacks.  Kolender v. Lawson, 461 U.S. 352, 358 (1983).  There may be occasions where arbitrary enforcement might occur, but the standard given to officials satisfies this court that such a risk is not present to such a degree as to justify facial invalidation.

Our conclusion that the quantity test survives a facial vagueness challenge is bolstered by comparison to other laws challenged as unconstitutionally vague on their face.  For example, in Morales, 527 U.S. at 47, 56-57, the Supreme Court found a statute prohibiting "loitering," defined as "remain[ing] in any one place with no apparent purpose," to be unconstitutionally vague.

> It is difficult to imagine how any citizen . . . standing in a public place with a group of people would know if he or she had an "apparent purpose." If she were talking to another person, would she have an apparent purpose? If she were frequently checking her watch and looking expectantly down the street, would she have an apparent purpose?

- 14 -

Id. at 56-57 (emphasis added).  Further, the law contained "no . . . guidelines" to government law enforcement; "In any public place in the city of Chicago, persons who stand or sit in the company of a gang member may be ordered to disperse unless their purpose is apparent."  Id. at 60.

Similarly, in Coates v. City of Cincinnati, 402 U.S. 611 (1971), the Court rejected a law making it a crime for a group of people to assemble on a sidewalk and "conduct themselves in a manner annoying to persons passing by."  Id. at 611. The Court found the law vague "because it subjects the exercise of the right of assembly to an unascertainable standard";

> Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, men of common intelligence must necessarily guess at its meaning.

Id. at 614 (quotations omitted) (emphasis added).

In contrast, in Grayned v. City of Rockford, the Court upheld an antinoise ordinance prohibiting diversions "which disturb[] or tend[] to disturb[6] the peace or good order of [a] school session or class."  408 U.S. at 108 (footnote added).

---

[6] "Tends to disturb" had previously been limited by the Illinois Supreme Court in another case to mean "imminent threat of violence," thus the Grayned Court assumed the state court would interpret the Rockford ordinance to "prohibit only actual or imminent interference with the 'peace or good order' of the school."  408 U.S. at 111-12.

Noting that "we can never expect mathematical certainty from our language," and acknowledging that the ordinance's terms were "marked by flexibility and reasonable breadth, rather than meticulous specificity," the Court nonetheless concluded that "it is clear what the ordinance as a whole prohibits." Id. at 110. The Roy City ordinance's quantity test is closer to the Grayned ordinance, with flexible and reasonably broad terms that still provide the necessary guidance, than it is to those laws struck down in Morales and Coates—laws lacking any standard of conduct whatsoever.

We note that many other courts to have considered an adult business ordinance's "significant or substantial" language have similarly concluded that it survives facial challenge. See ILQ Investments, Inc. v. City of Rochester, 25 F.3d 1413, 1418-19 (8th Cir. 1994) ("substantial or significant" is not "devoid of meaningful legislative standards"); Mom N Pops, Inc. v. City of Charlotte, 979 F. Supp. 372, 392, 393 (W.D.N.C. 1997) ("substantial or significant" is "not devoid of meaningful legislative standards and [is] reasonably specific and precise, bearing in mind that unavoidable imprecision is not fatal and celestial precision is not necessary.") (quotations omitted); 15192 Thirteen Mile Road, Inc. v. City of Warren, 626 F. Supp. 803, 820 (E.D. Mich. 1985) ("[T]he word 'substantial' as used in the definition of Adult Book Store is not so indefinite as to render the Ordinance void and unenforceable. That term has been construed as having an

ascertainable meaning in numerous statutory schemes.") (quotation omitted); Cline v. City of Okla. City, 839 P.2d 657, 658, 659 (Okla. Crim. App. 1992) (holding "significant portion of its stock in trade" definition not vague on its face, but vague as applied to plaintiff). But cf. Ellwest Stereo Theater, Inc. v. Boner, 718 F. Supp. 1553, 1581 (M.D. Tenn. 1989) (finding "substantial or significant" unconstitutionally vague because city officials in charge of enforcing the ordinance could not define what the phrase meant; "Clearly, if the regulating authority cannot determine the establishments which are subject to its authority, the establishments themselves cannot be expected to determine whether they need to be licensed or not."); City of Knoxville v. Entm't. Res., LLC, 166 S.W.3d 650, 656-57 (Tenn. 2005) (holding "substantial or significant" to be unconstitutionally vague because "the determination of what constitutes a 'substantial or significant portion' of a business's 'stock and trade' under the ordinance is an entirely subjective one"; also relying heavily on the fact that "the officers charged with enforcing the ordinance [are unable] to define its key terms").

In sum, we conclude that the ordinance's definition of an adult bookstore as one with a "significant or substantial" portion of its wares devoted to adult material survives Dr. John's facial vagueness challenge.

### b. "Characterized by their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas"

Dr. John's contends that this phrase is impermissibly vague for its failure to

explain how one should determine whether a picture puts an emphasis on a certain portion of the body.[7]  Specifically, Dr. John's argues that "[e]mphasis being in the mind of the beholder, Plaintiffs maintain that they cannot determine in advance how City officials will determine where 'the emphasis' of certain representations might be."  In the context of a facial challenge, we cannot agree.

The ordinance challenged in Young v. American Mini Theatres, Inc. contained a similar "characterized by an emphasis on" provision.  427 U.S. 50, 61 (1976) (citations omitted).  Although the Supreme Court discussed this provision in the context of whether the plaintiff had standing to challenge the ordinance when it plainly fell within its ambit, we find its reasoning persuasive on the question of the provision's facial vagueness:

> the only vagueness in the ordinances relates to the amount of sexually explicit activity that may be portrayed before the material can be said to "characterized by an emphasis" on such matter.  For most films the question will be readily answerable . . . .

Id. (emphasis added).  Like the Supreme Court, we find that in most of the

_____

[7] The ordinance defines "specified sexual activities" as

1.      Sex acts, normal or perverted, including intercourse, oral copulation, masturbation or sodomy; or
2.      excretory functions as a part of or in connection with any of the activities described in (1) above.

Further, the ordinance provides that "specified anatomical areas" "shall mean human genitals, anus, cleft of the buttocks, or the female breast."

ordinance's applications, a business will have clear notice as to what the material in its store emphasizes. We therefore join the other courts that have rejected facial vagueness challenges to similar language in other SOB ordinances. See ILQ, 25 F.3d at 1419; SDJ, Inc. v. City of Houston, 837 F.2d 1268, 1278 & n.36 (5th Cir. 1988) ("A common sense reading of [the definition of an adult 'enterprise,' which contains the phrase 'characterized by an emphasis on,'] shows that [it is] adequately precise.") (dicta); Hart Book Stores, Inc. v. Edmisten, 612 F.2d 821, 833 (4th Cir. 1979) ("distinguished or characterized by an emphasis on" sexual explicitness is "reasonably specific and precise"), 15192 Thirteen Mile Road, 626 F. Supp. at 820 (same).[8]

## B. Prior Restraint

Dr. John's also contends that the ordinance is facially invalid as an impermissible prior restraint on First Amendment activity. Historically, prior restraint—that is, requiring approval before speech is allowed—was considered a

---

[8] Dr. John's also argues that our reference in Z.J. Gifts D-4, L.L.C. v. City of Littleton, 311 F.3d 1220 (10th Cir. 2002), rev'd on other grounds, 541 U.S. 774 (2004), to whether a statute can be narrowly construed by state courts implies that a statute is void for vagueness if it has not been so construed. However, the discussion of narrow construction was in the context of prudential standing; as noted above, where a law is unquestionably applicable to a party, that party can only bring a facial challenge if the law (1) deters a substantial amount of legitimate expression and (2) is not subject to a narrowing construction. Id. at 1229. We do not find that discussion particularly relevant or helpful to our consideration of the merits of this vagueness challenge.

more significant restriction on speech than subsequent punishment. 4 Ronald D.

Rotunda and John E. Nowak, Treatise on Constitutional Law 315 (1999). As our

jurisprudence has developed, courts have permitted some forms of prior restraint,

such as licensing requirements for adult businesses,

> so long as two classic evils of prior restraints are not present. First, the
> licensing scheme may not vest unbridled discretion in the government
> officials charged with the responsibility of granting or denying the
> license. Second, the licensing scheme may not allow the decisionmaker
> unlimited time to decide on matters affecting the license; otherwise,
> there is the risk of indefinitely suppressing speech.

Essence, Inc. v. City of Fed. Heights, 285 F.3d 1272, 1289-90 (10th Cir. 2002)

(quotations and citations omitted).

Dr. John's essentially argues that both evils are present; it claims that (1)

the ordinance's "significant or substantial" standard gives City officials overly

broad discretion in determining whether a business is an SOB and thus risks

censoring speech; and (2) the ordinance effectively denies judicial review of the

City's decision that a businesses is an SOB (risking the "indefinit[e]

suppressi[on]" of speech).[9]

---

[9]     That Dr. John's has not applied for an SOB license is no barrier to its
challenge:

> Recognizing the explicit protection accorded speech and the press in
> the text of the First Amendment, our cases have long held that when a
> licensing statute allegedly vests unbridled discretion in a government
> official over whether to permit or deny expressive activity, one who is
> subject to the law may challenge it facially without the necessity of

(continued...)

- 20 -

## 1. Overly broad discretion

Dr. John's contends the ordinance is invalid because it gives city officials unbridled discretion in determining whether a business must apply for an SOB license (i.e., whether a "significant or substantial" portion of its business is devoted to adult material). However, the discretion given to officials goes only to what kind of license a business must operate under, not whether the business may operate in the first place. We conclude that such discretion does not justify facial invalidation of the ordinance.

Dr. John's points to several Supreme Court decisions in support of its argument. However, the common thread running through these decisions—and missing here—is that the discretion given to local officials had a direct effect on whether speech would occur at all. In City of Lakewood v. Plain Dealer Publishing Co., the Court declared unconstitutional an ordinance that required newspapers to apply for permits before they could place a newsrack on city property because the ordinance "g[ave] the mayor unfettered discretion to deny a

---

[9](...continued)
first applying for, and being denied, a license.

City of Lakewood v. Plain Dealer Publ'g. Co., 486 U.S. 750, 755-56 (1988). This is because "in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. And these evils engender identifiable risks to free expression that can be effectively alleviated only through a facial challenge." Id. at 757 (citations omitted).

permit application and unbounded authority to condition the permit on any additional terms he deems 'necessary and reasonable.'" 486 U.S. 750, 753, 770-72 (1988). Similarly, in FW/PBS, Inc. v. City of Dallas, the Court found that an adult-business licensing scheme was an unconstitutional prior restraint, as it essentially allowed for "indefinite postponement of the issuance of a license." 493 U.S. 215, 226-27 (1990) (plurality).[10] In other words, officials could stymie the very opening of an adult business by sitting on the license application. Finally, in Forsyth County v. Nationalist Movement, the Court struck down a parade permit ordinance, finding:

> [t]he decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees.

505 U.S. 123, 133 (1992).[11]

The present scheme is relevantly different. Here, Roy City officials have

---

[10] These pronouncements were made by a three-member plurality. However, three other Justices concurred with the plurality's conclusion. 493 U.S. at 238.

[11] The Forsyth County ordinance allowed for fees up to $1,000 per day, and "the county administrator was empowered to adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed." 505 U.S. at 126-27 (quotations omitted).

no discretion over <u>whether</u> to grant or deny an SOB license application—a temporary license "shall immediately issue" upon the filing of an application, and a permanent license "shall [be] issue[d]" within forty days of the filing of the application unless some specifically enumerated criterion is not met.[12] The City may seek to require Dr. John's to operate under an SOB license rather than under a general business license, but nothing in its licensing structure gives it the

---

[12] Section 5 of the ordinance provides:

The City shall approve the issuance of a license unless one or more of the following is found by a preponderance of the evidence to be true:

1.     An applicant is less than eighteen (18) years of age.

2.     An applicant has failed to provide information as required by Section 4 [dealing with the information to be included in the license application] for issuance of a license or has falsely answered a question or request for information on the application form.

3.     The license application fee required by this Chapter has not been paid.

4.     An application has been convicted of a specified criminal activity, as defined in this ordinance, or has been shown to have committed a violation of Section 7(A) [permitting inspections] or Section 10(B) [license revocations] of this Ordinance within the previous year.

5.     In the case of a sexually oriented business license application, the premises is not in compliance with the interior configuration requirements of this Chapter.

An SOB employee license is reviewed under the same criteria, except for whether the business complies with the interior configuration requirements.

authority to prevent Dr. John's from doing business at all. So long as Dr. John's is willing to operate under an SOB license and to comply with its terms, the City has no authority to restrain its business operations or its speech.

Arguably, if the terms of the SOB license were so onerous that they effectively would preclude Dr. John's from operating at all, we might have a different situation. But that is not the case. The district court found that

> [t]he only apparent additional burdens imposed on Doctor John's are a somewhat extended application process (during which it is free to remain in business), a minor limitation on hours of operation, the requirement to place some extra lighting on the exterior of the business, and the requirement to enforce a no loitering provision.

Doctor John's, Inc. v. City of Roy, 333 F. Supp. 2d 1168, 1178-79 (D. Utah 2004). We also recognize that the ordinance precludes SOB's from employing anyone convicted of certain sex-related crimes and imposes certain fees.[13] However, these burdens are not so great as to grant the City "substantial power to discriminate" or "suppress[] disfavored speech" by deeming a business to fall in the category of an SOB. Even if those conditions are disadvantageous, they do not constitute a prior restraint on speech because they are not so onerous as to prevent Dr. John's from operating under an SOB license while it litigates whether

---

[13] The ordinance provides that application fees shall not exceed $200 for an SOB license and $100 for an SOB employee license and that annual renewal fees shall not exceed $100 for an SOB license and $50 for an SOB employee license. The record does not indicate precisely what the current fees are or whether there are comparable fees required for a general business license.

it should, instead, receive a general business license.

## 2. Judicial review

Dr. John's also contends that it is "effectively denied judicial review" of the City's decision that it qualifies as an SOB because it cannot obtain review of the City's decision unless it applies for such a license, which it does not wish to do. This argument misapprehends the law regarding judicial review and prior restraint. Prompt judicial review is relevant to the question of prior restraint because a licensing scheme with no limit on the time to decide matters affecting the license "'risk[s] . . . indefinitely suppressing speech.'" Essence, Inc., 285 F.3d at 1290 (quoting FW/PBS, 493 U.S. at 226). In other words, the concern evidenced by prior restraint cases is that a party will have to refrain from speaking while it waits for a decision from the licensing authority. Here, as pointed out above, Dr. John's can, if it wishes, immediately operate under an SOB license while it litigates whether it qualifies for a general business license.[14] We see no basis here to sustain an attack on this licensing scheme based upon the judicial review procedures available to Dr. John's. See City of Littleton v. Z.J. Gifts, L.L.C., 541 U.S. 774, 777, 784 (2004) (upholding a similar licensing provision against a prior restraint/ judicial review challenge).

_____

[14] The City's attorney stated at Oral Argument that Dr. John's could apply for a general business license (which the City would deny) and then Dr. John's could appeal this denial.

## C. Time/Place/Manner

In <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41 (1986), the

Supreme Court established that ordinances targeting the so-called "secondary

effects" of adult businesses are analyzed as regulations aimed at the time, place,

and manner of speech.  <u>Id.</u> at 46.  Such a regulation will be upheld if it is content

neutral, "narrowly tailored to serve a significant governmental interest," and if it

"leaves open ample alternative channels of communication."  <u>Z.J. Gifts D-2,</u>

<u>L.L.C. v. City of Aurora</u>, 136 F.3d 683, 688 (10th Cir. 1998).  Roy City's

ordinance was enacted to protect against negative secondary effects and thus

meets the "content-neutral" prong.  <u>See, e.g.</u>, <u>id.</u> at 686-87.[15]  Further, Dr. John's

does not argue that the ordinance fails to leave open alternative means of

communication; thus, the only question on appeal is whether the ordinance is

---

[15] At the outset of its "Time/Place/Manner" argument on appeal, Dr. John's appears to concede that the ordinance is properly analyzed as a content-neutral law.  However, it later cites <u>Axson-Flynn v. Johnson</u>, 356 F.3d 1277 (10th Cir. 2004), a case involving religious discrimination, and argues that "the City's decisions here were made in an effort to impose unlawful censorship."  Further, in its reply brief, Dr. John's argues that, because the ordinance arguably includes Dr. John's in its ambit, and because Dr. John's "sells only a minority of adult materials, and caters heavily to women," the ordinance is in fact content-based and thus should be subject to strict scrutiny.  As noted above, these arguments are foreclosed by a long line of precedent finding SOB ordinances to be content-neutral regulations.  <u>See, e.g.</u>, <u>Z.J. Gifts D-2</u>, 136 F.3d at 687 ("'With respect to businesses that <u>purvey</u> sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are . . . "content-neutral."'") (quoting <u>City of Renton</u>, 475 U.S. at 49) (emphasis in original) (alterations omitted).

narrowly tailored to serve a significant government interest.

It is well established that combating the secondary effects of adult businesses is a "significant governmental interest." See, e.g., City of Renton, 475 U.S. at 50; Z.J. Gifts D-2, 136 F.3d at 688. Dr. John's does not challenge that principle, but rather contends it is simply not the kind of adult business that can be thought to produce negative secondary effects. Specifically, Dr. John's argues that the studies cited in support of the Roy City ordinance do not consider businesses (like Dr. John's) that sell materials only for off-site consumption, carry only a "small amount of adult videos" along with "a substantial inventory of general merchandise," and have a clientele that is 40% women.

In order to show that a challenged ordinance promotes a significant government interest, "the government bears the burden of providing evidence of secondary effects, where it relies on those secondary effects as the justification for restricting speech." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1197 n.8 (10th Cir. 2003) (citing City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 437 (2002) (plurality)). In Heideman, we canvassed the Supreme Court's secondary effects decisions and outlined the basic principles for determining whether this burden has been met. First, we noted that, in City of Renton, the Supreme Court rejected any argument that cities must "'conduct new studies or produce evidence independent of that already generated by other cities,'" and

affirmed that the city may rely on evidence "'reasonably believed to be relevant to the problem the city addresses.'"  348 F.3d at 1197 (quoting City of Renton, 475 U.S. at 51-52).  Then, after discussing several other decisions, we undertook a thorough analysis of the Court's recent decision in Alameda Books, which sought to "clarify the standard for determining whether an ordinance serves a substantial government interest under City of Renton."  We explained:

> The [four-member] plurality distinguished between two parts of the Renton intermediate scrutiny framework: whether an ordinance is content-neutral and whether it serves a substantial governmental interest while leaving open alternative avenues of communication. Only with regard to the latter would the courts "examine evidence concerning regulated speech and secondary effects."

> Even as to that connection, the plurality reiterated that the Court had "refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech."  It stated that cities are entitled to rely, in part, on "appeal to common sense," rather than "empirical data," at least where there is no "actual and convincing evidence from plaintiffs to the contrary."  In so holding, the Alameda plurality provided the following observation regarding the deference properly accorded to legislative findings under the second prong of the [United States v.] O'Brien[, 391 U.S. 367 (1968)] test:

>> This is not to say that the municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in Renton. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence

- 28 -

renewing support for a theory that justifies its ordinance.

Id. at 1199 (quoting Alameda Books, 535 U.S. at 438-41) (citations omitted) (emphases added).[16]

Here, the studies cited by Roy City certainly fit Heideman's description of "pre-packaged"—as the City acknowledges, many of the studies are the same as those relied upon by the city of Aurora in Z.J. Gifts D-2.[17] Dr. John's argues that "common sense shows" that these studies are not relevant to an adult business like Dr. John's. However, simply stating that it is a "different kind" of adult business is not, by itself, sufficient to "cast direct doubt" on the rationale underlying the City's ordinance. Heideman, 348 F.3d at 1199 ("[C]ities are entitled to rely, in part, on 'appeal to common sense,' . . . at least where there is no actual and convincing evidence from plaintiffs to the contrary.") (emphasis added); cf. Z.J. Gifts D-2, 136 F.3d at 690 ("[E]ven if [the appellant] is a new type of adult business, it may not avoid time, place and manner regulation that has been

---

[16] Justice Kennedy concurred, but "did not criticize the plurality's approach." Heideman, 348 F.3d at 1199.

[17] The Roy City Ordinance cited studies from Phoenix, AZ (1984); Minneapolis, MN (1980); Houston, TX (1997); Utahpolis, UT; Amarillo, TX; Garden Grove, CA (1991); Los Angeles, CA (1977); Whittier, CA (1978); Austin, TX (1986); Seattle, WA (1989); Oklahoma City, OK (1986); Cleveland, OH and Dallas, TX (1997); St. Croix Co., WI (1993); Bellvue, WA (1998); Newport News, VA (1996); and Phoenix, AZ (1995-98). In Z.J. Gifts D-2, the town cited studies from Garden Grove, CA; Austin, TX; Oklahoma City, OK; Indianapolis, IN; Minneapolis, MN; Whittier, CA; and Amarillo, TX. 136 F.3d at 687 n.1.

justified by studies of the secondary effects of <u>reasonably similar businesses</u>.")

(emphasis added). Thus, without more, the City's reliance on the "package" of

studies commonly invoked to justify SOB ordinances is quite permissible to meet

the City's slight initial burden, even if the studies do not address SOB's precisely

like Dr. John's. <u>Alameda Books</u>, 535 U.S. at 438 ("[A] municipality may rely on

any evidence that is "reasonably believed to be relevant"); <u>id.</u> at 451 (Kennedy, J.,

concurring) (noting that "very little evidence is required" to satisfy city's

threshold burden); <u>see also</u> <u>City of Renton</u>, 475 U.S. at 51-52.[18]

Dr. John's makes two arguments beyond its basic contention that it is a

different kind of SOB. First, it claims that the ordinance is not narrowly tailored

to serve a significant government interest because it fails to make a distinction

between businesses which have entertainment on the premises ("on-site"

businesses) and those which require customers to leave the premises to view or

use their purchases ("off-site" businesses). Next, it argues that it has put forward

evidence sufficient to call the City's rationale into question and thus invoke the

---

[18] Dr. John's makes much of the fact that the Roy City ordinance purports to rely on a study of "Utahpolis," arguing that the "inclusion of a report from a non-existent city raises serious questions as to the reasonable reliance by the city on" the studies cites in the ordinance's preamble. The City responds that this reference was a typographical error, and that it intended to reference a study of Indianapolis, Indiana. In any event, we have recognized that cities do and may rely on "seemingly pre-packaged studies" to support adult business ordinances, <u>Heideman</u>, 348 F.3d at 1197; the existence of an error in the listing of these pre-packaged studies does not carry much weight.

Alameda Books burden-shifting scheme. We consider these arguments in turn.[19]

## 1. On-site versus off-site businesses

Dr. John's primarily relies on the Fifth Circuit's decision in Encore Videos, Inc. v. City of San Antonio, 330 F.3d 288 (5th Cir. 2003). In that case, the court held that an ordinance which regulated both on-site and off-site adult businesses was not narrowly tailored because the City failed, as a threshold matter, to provide evidence that off-site businesses caused negative secondary effects. Id. at 294-95.[20]

---

[19] Dr. John's also argues that the ordinance is not narrowly tailored because its definition of an SOB is too broad, citing Executive Arts Studio, Inc. v. City of Grand Rapids, 391 F.3d 783 (6th Cir. 2004) and Dr. John's, Inc. v. City of Sioux City, 305 F. Supp. 2d 1022 (N.D. Iowa 2004). However, both of those cases involved SOB ordinances with substantially broader definitions of an SOB. In Executive Arts Studio, an SOB was any business with a "segment or section" of its store devoted to adult material, which the court noted "encompasses multiple establishments which would never be defined as adult bookstores in everyday English, such as a Walden's or Borders [bookstore]." 391 F.3d at 796. And in Sioux City, the ordinance was written so that "a business selling any item of 'adult media' and any item of 'lingerie' would qualify as a 'sex shop' . . . ." 305 F. Supp. 2d at 1036. These ordinances are far different from Roy City's, which only applies to stores with a "significant or substantial" portion of adult material. We cannot conclude that the Roy City ordinance is so broad.

[20] The Fifth Circuit reasoned that

[o]ff-site businesses differ from on-site ones, because it is only reasonable to assume that the former are less likely to create harmful secondary effects. If consumers of pornography cannot view the materials at the sexually oriented establishment, they are less likely to linger in the area and engage in public alcohol consumption and other undesirable activities.

(continued...)

However, as the district court noted, and as <u>Encore Videos</u> specifically acknowledges, <u>see id.</u> at 295, this circuit's decision in <u>Z.J. Gifts D-2</u> rejected the on-site/off-site distinction as a basis for striking down an adult business ordinance as an unconstitutional time/place/manner restriction. In determining whether the <u>Z.J. Gifts D-2</u> ordinance was narrowly tailored towards a significant interest,[21] we began by finding that the government's interest in preventing secondary effects was not affected by the fact that the businesses it regulated included off-site adult businesses. 136 F.3d at 688. We then considered the plaintiffs' argument that the provision was not narrowly tailored. We recognized that, although "time, place or manner regulations on protected speech must be narrowly tailored," they "'need not be the least restrictive or least intrusive means of doing so.'" <u>Id.</u> at 689 (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 798 (1989)). This principle

> recognizes the judiciary's limited role in reviewing content-neutral limitations on speech. "It is not [the court's] function to appraise the

---

[20](...continued)

<u>Id.</u> at 295.

[21] We first rejected the argument that reliance on studies of "slightly dissimilar businesses" (<u>e.g.</u>, studies that may have focused only on on-site businesses when the ordinance also regulated off-site businesses) made any difference to the question of whether the ordinance was "content neutral." 136 F.3d at 687 ("[D]ifferences in the mode of delivery of sexually oriented materials are constitutionally insignificant for purposes of determining an ordinance's content-neutrality.").

wisdom of [the city's] decision[.]" Renton, 475 U.S. at 52. . . . Instead, because legislative bodies are entitled to "reasonable inferences" suggested by the legislative record before them, . . . the court simply determines whether the ordinance, as promulgated, "affects only categories of businesses reasonably believed to produce at least some of the unwanted secondary effects" the city seeks to regulate. ILQ Investments[, Inc. v. City of Rochester], 25 F.3d [1413,] 1418 [(8th Cir. 1994)]. If so, the court's review is complete, and it may not substitute its own judgment for that of the legislature, usurping the legislative body's policy-making function.

Id. Given that the city's ordinance "d[id] not attempt to regulate businesses which have a minimal or nonexistent connection to sexually oriented entertainment," and that the city did not "seek to justify its actions with a completely barren legislative record," we found the ordinance sufficiently narrowly tailored to the city's concern over secondary effects. Id. at 689-90. We concluded by noting that "even if [the adult business in question] is 'a new type of adult business, [i.e., one that provides only off-site adult material], it may not avoid [a] time, place and manner regulation that has been justified by studies of the secondary effects of reasonably similar businesses.'" Id. (quoting ILQ Investments, 25 F.3d at 1418). Thus, under Z.J. Gifts D-2, the mere fact that the ordinance reaches off-site as well as on-site businesses is insufficient for us to declare the ordinance unconstitutional.

Dr. John's argues that, even if Z.J. Gifts D-2 was correct when decided, it "needs to be re-examined in light of" Alameda Books. To the extent that this is an argument that Alameda Books alters the initial burden that the City must meet

- 33 -

to justify the ordinance—i.e., that the City must, as a threshold matter, present specific evidence of secondary effects caused by off-site businesses—we disagree. Alameda Books reiterated that a city does not face a "high bar" in meeting its initial obligation to show an ordinance is narrowly tailored towards a significant interest; it need only show that its evidence "fairly support[s]" its rationale. 535 U.S. at 438; see also id. at 451 (Kennedy, J., concurring) (noting that "very little evidence is required" to justify a secondary effects ordinance). Thus, even after Alameda Books, our disagreement with the Fifth Circuit's theory that evidence of a specific connection between off-site businesses and secondary effects is necessary at the outset still stands.

However, we agree with Dr. John's to the extent it is arguing that a distinction between on-site and off-site businesses might be relevant in the Alameda Books burden-shifting framework. Indeed, this conclusion is not inconsistent with our holding in Z.J. Gifts D-2. In that case, we specifically noted that the inquiry into whether the studies used to support a city's ordinance addressed dissimilar businesses "may well be relevant in determining whether the ordinance is 'narrowly tailored to regulate only those adult uses shown to have caused adverse secondary effects' under Renton." 136 F.3d at 687 (quoting ILQ Investments, 25 F.3d at 1417). Further, though we specifically characterized the on-site/off-site distinction as "constitutionally insignificant" to the question of

content neutrality and "constitutionally irrelevant" to the question of the government's interest, we notably did not make any such sweeping statement about the relevance of the distinction to the question of narrow tailoring. Reading Z.J. Gifts D-2 together with Alameda Books, we conclude that, although a city need not initially come forward with specific evidence of a connection between negative secondary effects and each precise type of business regulated under its ordinance, a plaintiff may be able to challenge a city's rationale for its ordinance by pointing to evidence that its type of adult business (e.g., "off-site") is relevantly different than those types of businesses analyzed in the studies supporting the ordinance (e.g., "on-site").

Here, however, Dr. John's points to no evidence showing that off-site SOBs have materially different secondary effects that would call into question the studies relied upon by Roy City. Simply stating that off-site businesses are different from on-site businesses is not sufficient to shift the burden back to the city. We owe "deference to the evidence presented by the city" due to the fact that cities are "in a better position than the Judiciary to gather and evaluate data on local problems." Alameda Books, 535 U.S. at 440; see also id. at 451 (Kennedy, J., concurring) ("As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners.").

- 35 -

Thus, Dr. John's argument concerning on-site and off-site businesses fails to "cast direct doubt" on the City's rationale.

## 2. Dr. John's evidence

Dr. John's points to evidence that it claims "puts into question" the City's studies and, thus, the City's rationale for regulating adult businesses like Dr. John's. Specifically, Dr. John's points to two articles: The first article criticizes the methodology used in the most frequently cited secondary effects studies. Bryant Paul, Daniel Linz, and Bradley J. Shafer, Government Regulation of "Adult" Businesses Through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects, 6 Comm. L. & Pol'y 355, 367 (2001). The second article focuses on cities' zoning of "unpopular" churches and contends that cities are using zoning to restrict a religious message under the guise of "secondary effects"—a tactic Dr. John's contends is also used in the adult entertainment context. Von G. Keetch & Matthew K. Richards, The Need for Legislation to Enshrine Free Exercise in the Land Use Context, 32 U.C. Davis L. Rev. 725 (1999).

These articles were submitted as part of Dr. John's reply to the City's response to Dr. John's motion for summary judgment. Our review of the record leaves us in doubt as to whether the district court actually considered the articles. The court made no reference to them in its order disposing of the parties' motions

for summary judgment;[22] it did not affirmatively indicate whether it refused to consider them (perhaps as untimely) or, rather, that it had considered them and had simply concluded they were insufficient to meet Dr. John's burden to "cast direct doubt" on the City's studies.[23]

Further, our review of the Paul, Linz, and Shafer article suggests that it might cast doubt on the City's evidence and rationale.[24] We cannot conclusively determine whether it does, however, as we do not have the City's studies before us. In addition, it is not clear from the record whether all the City's studies were

_____

[22] The district court did state that Dr. John's had not made "any serious showing that the studies relied upon by the City were not appropriate." This reference to a "showing" does not make clear whether the court was referring to Dr. John's arguments about the City's studies or to the evidence it submitted to attempt to contradict those studies.

[23] We express no opinion as to whether, if the district court did in fact refuse to consider the evidence, such a decision was proper.

[24] That article, which purports to have reviewed 107 "secondary effects" reports cited in support of SOB ordinances, contends that "the methods most frequently used in these studies [purporting to detect secondary effects from adult businesses] are seriously and often fatally flawed." Paul, Linz, Shafer, supra, at 367-68. Further, the article asserts that those studies that are scientifically credible show no link between adult businesses and secondary effects. Id. at 367. At least one court has cited this article as casting doubt on the "pre-packaged studies" relied on by cities in support of adult business ordinances. Giovani Carandola, Ltd. v. Fox, 396 F. Supp. 2d 630, 651 (M.D.N.C. 2005) (noting that the article, along with Linz's expert testimony, "cast direct doubt" on the government's studies).

even before the district court.[25]  Given that the record is unclear as to precisely what evidence was considered by the district court, and given that a review of the parties' evidence supporting and countering a city's rationale is essential to determining whether an ordinance is narrowly tailored to the City's substantial interest in preventing secondary effects, see Alameda Books, 535 U.S. at 438-39, we conclude that the proper course is to remand this case to allow the district court to conduct a thorough analysis of the evidence under the Alameda Books burden-shifting scheme.  See Nelson v. Tiffany Indus., Inc., 778 F.2d 533, 538 (9th Cir. 1985) (reversing summary judgment and remanding where it was not clear whether the district court considered evidence on a "critical factual issue" in granting summary judgment).  See generally 28 U.S.C. § 2106 ("[A]ny . . . court of appellate jurisdiction may . . . vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and . . . require such further proceedings to be had as may be just under the circumstances.").

### D. Civil Disability Provision

As noted, the Roy City ordinance provides that the City "shall" grant an SOB or SOB employee license application unless, inter alia, the applicant has

---

[25] In its order disposing of the cross-motions for summary judgment, the district court says only that it had reviewed "the report of many of the studies relied upon by the City."

been convicted of a "specified criminal activity" within a specific time period (within the last two years for a misdemeanor; within the last five years for a felony or for two misdemeanors in a twenty-four-month period) (the "civil disability" provision).[26] Haltom, who has previous convictions for crimes which disqualify him under the ordinance,[27] challenges this provision as an

---

[26] The ordinance defines "specified criminal activity" as any of the following:

> prostitution or promotion of prostitution; dissemination of obscenity or illegal pornography; sale, distribution, or display of harmful material to a minor; sexual performance by a child; possession or distribution of child pornography; lewdness; sexual battery; rape; indecent exposure; indecency with a child; engaging in organized criminal activity relating to a sexually oriented business; sexual assault; molestation of a child; or distribution of a controlled substance; criminal attempt, conspiracy or solicitation to commit any of the foregoing offenses or offenses involving the same elements from any jurisdiction regardless of the exact title of the offense.

The offenses are only considered "specified criminal activity" if (1) less than two years have elapsed since conviction or release from confinement if the offense was a misdemeanor; (2) less than five years have elapsed since conviction or release from confinement if the offense was a felony; or (3) less than five years have elapsed since the last conviction or release from confinement if the person was convicted of two or more misdemeanors within any twenty-four-month period.

[27] Haltom has been convicted in Nebraska of distribution of obscene materials, see State v. Haltom, 653 N.W.2d 232, 235 (Neb. 2002), a conviction that Dr. John's concedes qualifies as a "specified criminal activity." Haltom was also recently convicted in Utah of dealing in material harmful to minors; at the time this appeal was briefed, an appeal of that conviction was pending.

unconstitutional restriction of his First Amendment rights.[28]

As a threshold matter, we must determine what level of scrutiny to apply to this civil disability provision. Dr. John's urges us to apply a "strict scrutiny" analysis, as the provision "operates as an outright ban on future protected expression of both individuals and businesses." Although some older cases involving similar disability provisions utilized such heightened scrutiny, see, e.g., Bayside Enters., Inc. v. Carson, 470 F. Supp. 1140, 1144-45 (M.D. Fla. 1979); Natco Theatres, Inc. v. Ratner, 463 F. Supp. 1124, 1129 (S.D.N.Y. 1979), most modern cases rely on the niche body of law that has developed around regulation of adult businesses and analyze the disability provisions under the time/place/manner standard of cases like City of Renton. See, e.g., Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County, 274 F.3d 377, 391-92 (6th Cir. 2001); Schultz v. City of Cumberland, 228 F.3d 831, 851-52 (7th Cir. 2000); Brownell v. City of Rochester, 190 F. Supp. 2d 472, 493-94 (W.D.N.Y. 2001); Tee & Bee, Inc. v. City of West Allis, 936 F. Supp. 1479,

---

[28] The district court characterized this issue as a challenge to the civil disability provision insofar as it precludes Haltom from obtaining an SOB employee license. We note that the ordinance also appears to preclude a business with an "officer, director, general partner, or other person who will participate directly in decisions relating to management and control of the business" from obtaining an SOB license where one of the aforementioned persons has a disqualifying conviction. However, neither Dr. John's nor Haltom challenges the district court's characterization of the claim. We therefore only consider the effect of the civil disability provisions on Haltom personally.

1485-86, 1489 (E.D. Wis. 1996).  We agree with the reasoning of these cases.

The civil disability provision, enacted to combat the secondary effects associated

with adult businesses, is a content-neutral regulation of the manner of expression

and will be upheld, per City of Renton, if it is narrowly tailored toward a

significant government interest.[29]

Dr. John's argues that the provision does not serve a significant interest

because "[t]he City has not demonstrated any connection in the legislative record

between the specified criminal acts and adverse secondary effects."  However, the

ordinance made several findings supporting such a connection.[30]  These findings

---

[29] Dr. John's does not argue that the civil disability provision fails to leave
open alternative channels of communication.

[30] Specifically, the City found as follows:

(2) Certain employees of unregulated sexually oriented businesses
. . . engage in higher incidence of certain types of illicit sexual behavior
than employees of other establishments.

. . . .

(23) The fact that an applicant for an adult use permit has been
convicted of a sexually related crime leads to the rational assumption
that the applicant may engage in that conduct in contravention of this
ordinance.

(24) The barring of such individuals from employment in sexually
oriented businesses for a specified period of years serves to prevent
distribution of illegal material, to prevent conduct which leads to the
transmission of sexually transmitted diseases, and to preclude the
establishment of criminal enterprises within the City.

(continued...)

essentially conclude that a person convicted of a sex crime—one of the secondary effects the ordinance seeks to combat—is likely to engage in that behavior again in the future, and that preventing that person from working at an adult business for a specified period of time will help to reduce the chance that such crimes will occur at the business. These conclusions—that recidivism occurs, and that one way to reduce sex-crimes at adult businesses is to prevent sex criminals from working there—are certainly reasonable conclusions for a legislative body to make. See, e.g., Deja Vu, 274 F.3d at 392 ("The Ordinance's civil disabilities provisions serve to weed out those applicants most likely to engage in the type of criminal behavior that the Ordinance seeks to redress . . . ."). Dr. John's points to no evidence to challenge the City's rationale; thus, we conclude that the City's legislative findings are sufficient to show the civil disability provision serves its interest in combating secondary effects. See Heideman, 348 F.3d at 1199 ("[C]ities are entitled to rely, in part, on 'appeal to common sense,' rather than 'empirical data,' at least where there is no 'actual and convincing evidence from plaintiffs to the contrary.'").

Dr. John's also argues that the ordinance is not narrowly tailored towards preventing these secondary effects. Critical to the question of narrow tailoring is whether the types of disabling crimes are related to the secondary effects sought

---

[30](...continued)

to be prevented (i.e., the prevention of sex-crimes) and whether the duration of the disability is temporary. See, e.g., Deja Vu, 274 F.3d at 392 (declaring civil disability provision constitutional "[i]n light of the temporary nature of the ban and the narrow reach of the provisions (applying only to those who have committed a felony sex crime within the last five years or a misdemeanor sex crime within the last two years"); Brownell, 190 F. Supp. 2d at 494-96 (generally upholding a civil disability provision but striking out the "non-sex crimes" as the city had not shown those crimes bore "any reasonable relation to furthering the governmental interest"); Tee & Bee, 936 F. Supp. at 1490 ("As construed, the provision denies a license based only on convictions for sex-related crimes. Furthermore, after five years has elapsed, an individual with a prior criminal conviction may once again be eligible. These built-in limitations on the scope of the provision ensure that licenses are denied only when the applicant has recently participated in the type of criminal activity associated with adult-oriented establishments, precisely the sort of activity which the ordinance seeks to impede."). The Roy City civil disability provision satisfies these requirements—it disqualifies an applicant only for convictions of sex-related crimes, and places temporary limits on the disqualification (two to five years) similar to those limits approved in other cases. The provision is thus sufficiently narrowly tailored

towards the secondary effects the City seeks to prevent.[31]

## E. Customers' Privacy Rights

Finally, Dr. John's argues that the ordinance infringes upon the privacy

---

[31] We acknowledge that the Seventh Circuit has taken a harder line against civil disability provisions. For example, in Schultz, the court found that

> these license ineligibility provisions absolutely disentitle classes of speakers from a category of expression. They produce a complete ban on certain expression for a disqualified group of applicants who, by definition, wish to speak, and such a drastic measure cannot be justified here as narrowly tailored to resist noisome secondary effects. Indeed, [the city] neither conducted nor cited any study establishing its basic premise that ownership or performance by those convicted of specified criminal activity or misconduct is more likely to lead to secondary effects than ownership or performance by anyone else.
>
> The government may regulate the conditions under which operators and performers may stage adult entertainment, and in accordance, it may withhold or revoke a license pending compliance with legitimate time, place or manner requirements. Yet the government may not categorically disenfranchise a class from protected expression in this licensing context, at least on the factual record Cumberland has compiled, because it thereby fails to provide the alternative channels for communication required by Renton and Young for those speakers.

228 F.3d at 853; see also Genusa v. City of Peoria, 619 F.2d 1203, 1219 & n.40 (7th Cir. 1980).

As an initial matter, both Schultz and Genusa are factually distinguishable from the present case; those cases involved ordinances with definitions of disabling criminal activity that included patently non-sex crimes. See Schultz, 228 F.3d at 853 n.6 (disabling offenses included "gambling" and "distribution of a controlled substance"); Genusa, 619 F.2d at 1217 (disabling offenses included any felony as well as any "crime or misdemeanor opposed to decency and morality"). However, to the extent that the Seventh Circuit holds that civil disability provisions are always unconstitutional, at least without specific studies or evidence showing the connection between sex criminals and secondary effects, we disagree for the reasons stated above.

rights of its customers. The district court did not rule on this claim. The City contends that this issue was not even raised by Dr. John's below, and urges us to refuse to consider it on appeal. Our review of the record reveals that the issue was not raised in Dr. John's complaint or motion for summary judgment, but was raised only obtusely at the conclusion of Dr. John's memorandum submitted along with its motion for summary judgment.

We need not decide whether this was sufficient to present the issue to the district court. See generally Lawrence Kaplan, Annotation, Sufficiency, in Federal Court, of Raising Issue Below to Preserve Matter for Appeal, 157 A.L.R. Fed. 581, 605 (1999) (noting that there is "[n]o bright-line rule to determine whether [an] issue has been properly raised in [the] trial court."). Even assuming it was not properly raised, both parties briefed the issue, the City does not argue that it is prejudiced by our consideration of the question, and, as discussed below, the issue is easily resolved on the merits. Thus, we exercise our discretion to consider this issue. Singleton v. Wulff, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. . . . Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt . . . .").

Dr. John's asserts that the ordinance infringes on the sexual privacy rights of its customers to purchase "marital aids."[32] However, Dr. John's fails to provide any explanation of how the ordinance would in any way restrict the sale of such devices. As the City points out, once an SOB is licensed, it is free to "sell[] as much sexually oriented merchandise as the market will bear," and there is no showing that Dr. John's could not obtain an SOB license if it wished (although it might not be able to retain Haltom as an employee). And, at least some marital aids would presumably be sold under even a general business license. This case is thus palpably different from those cases cited by Dr. John's in support of its argument. See United States v. Extreme Assocs., Inc., 352 F. Supp. 2d 578, 586 (W.D. Pa.), rev'd, 431 F.3d 150 (3d Cir. 2005) ("Defendants further argue that because the federal obscenity laws place a complete ban on the distribution of materials that an individual has the fundamental right to possess and view in private, the statutes should be subjected to the strict scrutiny test.") (emphasis added); Williams v. Pryor, 220 F. Supp. 2d 1257, 1259-60 (N.D. Ala. 2002), rev'd sub nom. Williams v. Attorney Gen., 378 F.3d 1232 (11th Cir. 2004) ("The constitutional guarantees that accompany plaintiffs' fundamental right to

_____

[32] Dr. John's has standing to assert the privacy rights of its customers. See Carey v. Population Servs. Int'l, 431 U.S. 678, 683-84 & 684 n.3 (1977) (holding that vendor of non-medical contraceptive devices has standing to assert rights of customers; noting that the case for third party standing was compelling "because the rights involved fall within the sensitive area of personal privacy"); see also Craig v. Boren, 429 U.S. 190, 192-97 (1976).

privacy will not permit the State of Alabama to <u>prohibit</u> plaintiffs from purchasing sexual devices for use within the confines of their private, adult, consensual, sexual relationships . . . .") (emphasis added); <u>People ex rel. Tooley v. Seven Thirty-Five E. Colfax, Inc.</u>, 697 P.2d 348, 369-70 (Colo. 1985) ("[The law] sweep[s] too broadly in [its] <u>blanket proscription</u> of all devices 'designed or marketed as useful primarily for the stimulation of human genital organs.'") (emphasis added). Thus, even assuming Dr. John's's customers have a sexual privacy right in the sexual devices and marital aids that Dr. John's sells, this right is in no way infringed by the Roy City ordinance.

## CONCLUSION

For the foregoing reasons, we AFFIRM the substantial majority of the district court's rulings. We do, however, REMAND for further proceedings on the question of whether the evidence concerning the "secondary effects" of adult businesses is sufficient to justify this ordinance as a reasonable time/place/manner regulation.[33]

---

[33] Dr. John's motion to strike Roy City's response to Dr. John's submission of supplemental authority is GRANTED.